IN THE

## SUPERIOR COURT OF JUDICATURE,

FOR THE

## COUNTY OF ROCKINGHAM, DECEMBER TERM,

### A. D. 1838.

---

## PARSONS *vs.* PARSONS and GILMAN.

The term alimony, as used in this state, generally signifies an allowance decreed to the wife on a divorce from the bonds of matrimony.

And this court has not power to allow alimony to the wife upon the mere desertion of the husband, disconnected from a suit for a divorce.

A distributive share in an intestate estate, to which a feme covert is an heir, does not vest absolutely in the husband. He may reduce it into possession, or release it, or assign it for a valuable consideration, by a deed to which she is not a party. But until he has received, released, or assigned it, or in some way barred her right, she has an interest which may survive to her in the event of his decease.

An administrator is a trustee for heirs and creditors; and this court, sitting as a court of chancery, has power over trusts of that description, upon a proper case for enforcing the rights of those interested in the trust.

The jurisdiction exercised by the court of chancery, in England, to make an allowance to the wife, for her maintenance, out of her equitable property, where the husband neglects to provide for her, is not founded upon the basis of trust or fraud, but is a branch of equity connected with the power to enforce a settlement upon her out of her estate; and seems originally to have been exercised only where the husband sought the aid of a court of equity to gain possession of his wife's property.

The statute giving this court jurisdiction in cases of trust and fraud does not empower the court, upon the application of the wife, to decree her a sum for her maintenance out of her equitable property where the husband has deserted her, even in cases where that property, being a distributive share of an estate, is in the hands of an administrator.

Nor can the court, in virtue of its authority to issue injunctions to prevent injustice, upon the application of the wife, restrain the husband from obtaining possession of her estate, where he is not asking the aid of any court, either at law or in equity, for that purpose.

IN CHANCERY. The bill, which was brought by Frances

Parsons, by John Smith, her next friend, against George H. Parsons and John Gilman, stated the marriage of the said George H. and Frances, October 3, 1826—that they lived together at Exeter, in said county, until about the 15th of November, 1831—that having but small means of subsistence, and becoming embarrassed with debt, he absconded, and left her, with one son, a child of said marriage, then about one year old, and thereafter withdrew to places wholly unknown to her, and remained absent and concealed from her, without attempting any correspondence, or giving her any information of himself, and without making any provision for the support of herself, or said child, for more than three years; during which absence she and said child lived in the family of her father, until September 15th, 1835, when her father died intestate, leaving considerable real and personal estate, the said John Smith, the said Frances the plaintiff, and two other daughters, being his children and heirs at law—That her father had, during his life time, as the defendants knew or suspected, purposed and expressed his intention to settle the portion of his estate which might fall to the plaintiff in such manner as to secure it for her sole and separate use; but by reason of divers circumstances, stated in said bill, and having for a long time prior to his decease no certain information of said George H. Parsons being alive, he omitted so to do—that she has at all times behaved as a dutiful, faithful, and affectionate wife—that no estate or property has been settled or secured to her separate use by her husband, and that she has no other provision or expectation for her future support besides her share in her father's estate——that in October, 1835, after her father's decease, and after letters of administration on his estate were granted to said John Smith, said George H. Parsons opened a correspondence with her, and after some time returned and continued to live with her about nine or ten months, in which time he obtained from said administrator, of her share of said estate, in furniture, goods, and otherwise, one thou-

sand dollars, or upwards, and became and was very improvident and intemperate, thereby wasting his property; whereupon, being desirous that he should settle and secure to her the remnant of her property, for her sole and separate use, and should secure the goods remaining in his hands which he had received of her portion, or purchased with her money so received, for the support of herself and children, she requested him so to do.

The bill then charged that the said George, combining with said Gilman, absented and withdrew himself, with said Gilman, to a distant place, for the purpose of disappointing her just expectations aforesaid, (said Gilman well knowing the premises,) and there, in a clandestine manner, Gilman obtained from him a pretended deed in fee of all his, said George's, right and interest in certain real estate therein described, including in fact all the real estate of her father, which deed he had caused to be recorded—That said Gilman pretends and sets up a purchase, from said George, of all her share in her father's real and personal estate, and of all his, said George's, goods and personal estate, on the 2d day of September, 1836, and that said George has given him deeds thereof, under which, or the like pretences, he has entered and claimed possession of her father's mansion house, and of the goods of said George, and claims of the administrator the residue of her said share of personal estate, and possession of her share of the real estate, for his own use, and threatens to sue therefor :—Whereas the bill charges that said George had absented and notoriously separated himself from her for some days before any conveyance or assignment to Gilman, and was then intending and preparing to obtain as much as he could of her patrimony, and desert her without taking care for her support, whereof Gilman had notice or reasonable grounds of belief : And further charges, that said George has since in fact absconded, or entirely deserted her and their said child, without providing or leaving her any means of

support besides the goods and personal property so claimed by Gilman—and that all the conveyances and assignments which Gilman has from him, if not obtained by fraud and imposition practiced on him, were made for the purpose of defrauding her of her rights and interest in her father's estate, and of alimony and maintenance from her husband, and were voluntary and without valuable or adequate consideration, and in trust for said George, and to screen said goods from her claims ; or if any consideration was paid, it was merely colorable, or refunded or held in trust for Gilman, and was greatly below the value of the property.

The bill then insisted that all such deeds of said George should be adjudged fraudulent, and void, and that the goods delivered him by the administrator, remaining in his possession, or in the mansion house, at the time of said supposed assignments, should still be taken to be part of her share in said estate ; and that she has a legal and equitable interest and lien in and upon her whole share in the real estate, and all undistributed of the personal estate, for a suitable and adequate settlement for herself and children, and for her support, which no act of her husband could defeat or impair.

Wherefore the bill prayed a discovery from Gilman, relating to such assignments and conveyances ; and that the defendants might fully answer in the premises ; and that said deeds of assignment to Gilman might be delivered up and cancelled, or otherwise declared and held void against her ; and that alimony, maintenance and support might be allowed and decreed for her, as just and reasonable, from the goods and estate of said George ; and that his goods, at the time of such assignments, might be secured and held to answer and satisfy her just claims, for alimony and maintenance, and for support of herself and child ; and that an account thereof, and of her share in the real and personal estate of her father, and the payments on account of the same, might be taken, &c.

Upon a motion for an order of notice to the defendant, George H. Parsons, a question arose respecting the jurisdiction of the court, and the right to grant relief upon the case stated in the bill.

*Freeman*, and *Goodrich*, for the plaintiff. The court has jurisdiction of this bill, and can grant relief.

1. There is here a want of adequate remedy at common law, and a plain matter of equity.

2. The statute gives jurisdiction in cases of trust. An administrator, by the statute of distribution, is trustee for the children or next of kin of the intestate. The plaintiff, not her husband, is the *ce. qu. trust*. She has done, and could do, no act to give him this trust interest, for it accrued since her marriage, by force of the law.

The legal property of an intestate's goods is in the administrator. He is always regarded by courts of equity, and at law, as trustee for the creditors, and those entitled to distribution.

The claim, also, of Gilman is not a legal one, but merely of a trust, under an assignment of a *chose in action.*

3. The statute also gives jurisdiction in cases of fraud. This bill shews conveyances or assignments made without consideration, and for fraudulent purposes, to defeat the plaintiff's legal and equitable claims, and fraudulently obtained.

4. The statute also gives jurisdiction and power to grant injunctions, where necessary to prevent injustice, according to the usage and practice of courts of equity. Here the plaintiff has plain legal and equitable rights, in jeopardy by the fraudulent and iniquitous practices of the defendants, or otherwise liable to loss, against equity, without she can have the interference of the court. The remedy is by injunction. Iniquity is injustice.

5. The bill, so far as it prays allowance for maintenance and support of the plaintiff, is clearly within the jurisdiction

of this court, which is most ample in all causes of marriage, divorce and alimony,—the constitution giving all the jurisdiction which might be exercised by any of the ecclesiastical courts, courts of chancery, special commissioners, or any tribunal whatever, in England. And the proceedings generally may be according to the usage of courts of equity, which differs not essentially from that of the ecclesiastical courts, both taking cognizance of suits for alimony in divers cases, and proceeding, in general, according to the course of the civil law, except that the spiritual courts enforce their sentences by ecclesiastical censures and excommunication.

This claim is for alimony, which is the wife's maintenance during her marriage—never after a dissolution of it by death of her husband, or divorce. It is generally granted on a temporary separation, whether by sentence or agreement—desertion of the husband, or his absence, whether wilful, or in captivity, or otherwise by constraint—his turning away his wife, or her leaving him for good cause. Sometimes, as in case of divorce *a mensa et thoro*, it is given by the ecclesiastical courts. In cases of lunacy, &c., of the husband, and where guardians or trustees intervene, or there is a proceeding *in rem* for property held in trust or fraudulently conveyed, and on a supplicavit, the remedy is in chancery.

The allowance to the wife on dissolution of the marriage by divorce, is either a restitution of her original rights, or a portion of her husband's estate analagous to her distributive share, if she were a widow. It is made once for all, without special reference to her maintenance, and becomes hers absolutely. It is improperly called alimony, for she then becomes *sui juris*, and must take care of herself.

This provision of the statute does not prejudice the legal rights of the wife to alimony, in its proper sense, which is the maintenance which her husband is obliged, and may be decreed, to give her during the coverture, and may be varied, from time to time, by the court, according to her merits and fortune, the ability of the husband, and the exigencies of the case.

The jurisdiction of all causes of alimony extends to all remedies to recover it which could be used in any court under our constitution and form of government, and to all goods, property and persons, liable for it, and to vacate all fraudulent transfers, or other acts, to defeat it.

If the plaintiff fails, therefore, on this part of the case, it must be for want of merits, either in law or equity, or from mere defect of form, and not because the court have not complete jurisdiction of the whole subject matter to give her justice and equity.

6. The jurisdiction of the court is also sustained by the consideration that the assignment, set up by the defendant Gilman, of a share of the personalty undistributed, passes no legal property in it, nor gives him any remedy at law to recover it in his own name ; but being merely of a *chose in action*, if it has any effect creates only a trust for him, in the administrator, or in Parsons and his wife, in whose name he must sue for it, making Gilman, instead of her, the *ce. qu. trust* of the property, which by the statute is distributable to her, and which by law survives to her free of any claim of her husband if she survives him.

Furthermore, as to the goods and furniture delivered over by the administrator to Parsons, and remaining specifically in his hands at the time of the pretended assignments to Gilman, the jurisdiction is sustained by the charges of misbehavior of Parsons, and the fraudulent intent and practices with which he obtained those goods, as regards the plaintiff's rights to the benefit of them for her future maintenance and support.

7. As to the assignment of her real estate, it is fraudulent as concerns alimony. The whole income of the real and personal estate is not more than reasonable. She has no means of support else. She has no power over the personal property for her support, unless by aid of a court of equity operating on a trust, or through her husband, or some legal guardian, or by a decree of a competent court for alimony.

She has a lien on the income of her real estate for alimony, and has no way to avail herself of her reversionary interest, or the fee itself, during the coverture. By the death of her husband, or a divorce, it comes to her in possession. She is not obliged, in favor of her husband, or his assignee having only his rights in her property, to apply this reversionary interest to her present support, if she could do it; and she could not if she would.

By the assignments, pretended and set up by Gilman, if at all effectual, Parsons has wholly disabled himself to perform his obligations to his wife for her support, and deprived her of all remedy against him, except by impeaching and avoiding those conveyances; and that she attempts to do by this bill, on the ground of fraud and trust, and to obtain her alimony.

Enough, it is apprehended, is charged by the bill on these grounds to sustain the jurisdiction of the court. Whether a sufficient case can be made out, and what relief granted, must be determined on the hearing.

8. In respect to the plaintiff's equitable right and lien on her personal property, and *choses in action*, for a settlement, the court here has all the jurisdiction usually exercised by the court of chancery in England, which generally does not order or attempt to make such a settlement directly, but only by impounding or withholding property held in trust, or on which there is an equitable lien, (which imports a trust) for the benefit of the wife; or by an injunction against the unconscientious use of process to get hold of the wife's trust property, or *choses in action*, in such manner as to defeat her equity. And all this jurisdiction this court has by the statute, if equity and good conscience is right, or staying the progress of fraud and iniquity is preventing injustice.

*Farrar*, for Gilman.

PARKER, C. J. It is contended, in the argument, that the jurisdiction of this court is most ample in all causes of marriage, divorce and alimony, the constitution giving all the powers which might be exercised by any of the ecclesiastical courts, courts of chancery, or any tribunal whatever in England ; and it is said that this bill may be sustained upon the ground of a claim for alimony, which is alleged to be the wife's maintenance during her marriage, and not some provision made for her upon, or after, a dissolution of it.

The term alimony, as generally used in the English books, means a portion, or sum allotted to the wife for her maintenance, from year to year, either during a matrimonial suit, or upon a divorce. 1 *Black. Com.* 441 ; 2 *Phill. Eccl. Rep.* 40, *Cooke* vs. *Cooke ;* 2 *Addams' Eccl. Rep.* 1, *Street* vs. *Street ;* 1 *Haggard's Eccl. Rep.* 23, *Hamerton* vs. *Hamerton ;* 3 *Haggard* 322, *DeBlaquiere* vs. *DeBlaquiere.* And it has been held that it shall be sued for in the spiritual courts, and not in chancery. 2 *Shower's Rep.* 290. It may be allotted *pendente lite.*

There are instances where the term is used as applied to her maintenance, generally, without regard to a divorce ; but in its more usual acceptation it is applicable to an annual sum, or a portion, decreed upon a separation or divorce, *a mensa et thoro.* This is fully shown by numerous cases in the ecclesiastical reports. " In a legal sense it is taken for that allowance which a married woman sues for, and is entitled to, upon separation from her husband." *Jacob's Law Dic., Tit. Alimony.* But as used in this state its signification is not precisely the same. We have here no divorces of that character. No ecclesiastical courts, with a jurisdiction similar to those of England, were ever organized here.

Prior to the revolution divorces are supposed uniformly to have been granted by the legislature, as they are sometimes granted by parliament in England. No law is found giving the ordinary courts of judicature any power upon the subject. They were so granted afterwards, and prior to the adoption of the constitution in 1783.

Parsons
*vs.*
Parsons et al.

In the edition of the laws printed 1780, page 115, is an act to dissolve the marriage between Robert Rogers, and Elizabeth his wife, passed March 4, 1778.

And during the existence of the provincial government, that part of the jurisdiction of the ecclesiastical courts, relating to the probate of wills and settlement of estates, was exercised by judges of probate, with an appeal to the governor and council, as the supreme court of probate. *Prov. Laws* 103—106.

Upon the adoption of the constitution, in 1783, it was deemed expedient to make a different provision in this respect, and the clause referred to in the argument was inserted, providing that " all causes of marriage, divorce and alimony, and all appeals from the respective judges of probate, shall be heard and tried by the superior court, until the legislature shall by law make other provision."

It is evident, from this view of the matter, that this clause of the constitution was not intended to create any new rules in relation to marriage, or its dissolution, or the maintenance of married women. It provided for a mere transfer of the jurisdiction which had existed in the assembly and the governor and council, leaving the legislature to make such provision upon the subject as should afterwards be deemed expedient.

In 1791 the legislature passed an act, specifying the causes for which divorces might be granted, and providing that " the justices of the superior court of judicature may, in all cases where a divorce is decreed, restore to the wife all her lands, tenements and hereditaments, and may assign to the wife such part of the real and personal estate of her late husband, as, all circumstances duly considered, they may think just and reasonable," &c.

This act is still in force, and has ever since been regarded as a legislation upon the whole subject, and not as in aid of any practice such as is adopted in the English ecclesiastical courts.

It embraces nearly all of the causes of divorce from bed and board in England, and authorizes, in all the cases specified, a divorce from the bonds of matrimony. No other provision for the maintenance of the wife, or for alimony, by decree of this court, has been known here, except that authorized by this statute ; unless a small sum sometimes ordered to be paid to the wife, to enable her to defend against the application of the husband for a divorce, may be so termed.

There were doubtless two reasons why the legislature, instead of providing for a yearly allowance to the wife, for her maintenance, authorized a restoration of her real estate, and an absolute assignment of a part of the husband's estate. One was, the nature of the separation, being an entire dissolution of the marriage : another, the nature of the property in a new country, where the income depended very much upon personal exertions.

Probably the assembly of the province, when they exercised the jurisdiction, made a similar provision for, or in lieu of, alimony.

As an allowance to the wife, for her support, upon a divorce, it took the name of alimony, and has long been so designated in legal parlance here. The learned editor of the edition of the laws published in 1815 so designated it in the margin of the act, and in the index of that edition, and this was followed in the edition of 1830.

In Massachusetts the legislature made a somewhat similar enactment for the benefit of the wife, with some further provisions ; and in that state, also, what is thus allowed her is understood to be alimony. 1 *Mass. Statutes (ed.* 1807) 303 ; 2 *Mass. R.* 223, *West* vs. *West.*

Alimony here, then, as used in the constitution, must be understood to mean the provision or allowance made to the wife upon a divorce.

It is not suggested that the case of this plaintiff comes within any of the causes for a divorce. If it did we should not decree it, sitting as a court of chancery.

If this bill may be sustained, it must be by virtue of the statute of 1832, which, among other grants of chancery jurisdiction having no reference to matters of this kind, gives the court chancery powers in all cases of fraud, trust, accident and mistake, where there is not a plain, adequate and sufficient remedy by the rules of the common law; and allows us, for the purpose of carrying the powers granted into effect and doing equity and justice between party and party, to make all equitable and necessary decrees, orders and judgments; and contains a further provision, authorizing the granting of writs of injunction, whenever the same shall be necessary to prevent injustice.

The plaintiff's counsel contend that here are three distinct grounds upon which the jurisdiction may be sustained, viz., trust, fraud, and the prevention of injustice.

But this all resolves itself into the question whether here is any trust, within the meaning of the statute, for the benefit of the wife, which the court can enforce. If there is no such trust, there is no fraud suggested that the court can reach, nor any injustice which will authorize the issuing of an injunction. We have not a general jurisdiction to compel husbands to deal justly and kindly by their wives.

There is no question that a trust exists here in the administrator, for the benefit of those entitled to distributive shares in the estate; but there is nothing to enforce against him. It is not pretended that he fails in his duty, and that a remedy must be sought against him here.

Does this case disclose a trust for the benefit of the wife, upon which we can proceed, for her relief, against her husband and his assignee?

The property in question was derived from the estate of the father of the wife. Had she been unmarried she would have taken the whole absolutely, and the administrator would have held her share of the personal estate, as trustee for her benefit. But at the time of the decease of her father she was under coverture.

In 12 *Pick.* 175, *Com'th* vs. *Manley*, it is said that a legacy given to the wife vests absolutely in the husband, and " so the wife's distributive share in an intestate estate vests in the husband." By this it must have been intended that he may claim or reduce it to possession, to his own use.

Neither a legacy to a wife, nor a distributive share in an estate, in which she is interested, vests in the husband absolutely. 9 *Vesey* 177, *Wildman* vs. *Wildman*. They are not like her personal property in possession, which becomes absolutely his. But they are classed with, and sometimes called, her choses in action. *Clancy's Rights, &c., of Husband & Wife* 109, *book* 1, *ch.* 8 ; *Com. Rep.* 725, *Brothero* vs. *Hood ; Com. Dig., Bar. & Feme. E,* 3. If the husband reduce them to possession, as he may, they become absolutely his own. *Clancy* 111 ; 2 *Story's Eq.* 631. And he may release them, or assign them for a valuable consideration, and by a deed to which she is not a party. *Clancy* 120 ; 5 *N. H. Rep.* 564, *Tucker* vs. *Gordon.* But until he has reduced them into possession, or in some other way barred her right, he has only a qualified interest, and if he die first the right survives to her. *Clancy* 109 ; 2 *Ves., sen.,* 675, *Garforth* vs. *Bradley ;* 5 *Johns. Ch. Rep.* 196, *Schuyler* vs. *Hall.* And possession by the husband, as executor and trustee, is not a sufficient reduction into possession, to bar her of her right. 12 *Ves.* 497, *Baker* vs. *Hall ;* 16 *Ves.* 413, *Wall* vs. *Tomlinson.* If, however, he survive his wife, he is entitled to administration, and to recover and receive them to his own use. 1 *Atk.* 458, *Humphrey* vs. *Bullen ;* 6 *Johns. Rep.* 112, *Whitaker* vs. *Whitaker ;* 1 *P. Williams* 380, *Squib* vs. *Wyn,* and *Cart* vs. *Rees, cited* 381 ; 3 *N. H. Rep.* 129, *Judge, &c.,* vs. *Chamberlain ;* 2 *Kent's Com.* 114.

The distributive share of the plaintiff in her father's estate the husband may claim and receive to his own use ; but until he has received, released or assigned it, or in some way barred her right, she has an interest which may survive to her in the event of his decease.

If the husband makes a voluntary assignment of the wife's portion, it is said the volunteer must stand in the place of the husband. 2 *Atk.* 420, *Jewson* vs. *Moulson ;* 1 *Brown's C. R.* 51 ; 9 *Ves.* 99.

There being here a trust in the administrator, which might enure to the benefit of the plaintiff, if her right is not barred by the proceedings of the husband, this court has jurisdiction of the subject matter of it, as such, under the clause of the statute which has been cited ; and when a proper case arises for enforcing her rights against the administrator, may entertain a bill for that purpose ; as, if the husband should die without reducing it into possession, or having made an assignment or release which would operate against her. And we might, perhaps, in such case enquire whether the assignment was for a valuable consideration.

But the important question in this case still remains,—Has she any rights which the court can protect and enforce against her husband and his assignee, on the facts disclosed in this bill, assuming them to be true ?

Courts of equity will not interfere to restrain or limit the husband in the just exercise of his marital rights. 2 *Story's Eq.* 631. But the court of chancery, in England, has in many instances, under particular circumstances, sustained applications for similar relief to that asked in this case. The grounds upon which they entertain this jurisdiction have not been uniform, and the principle on which it is supported is not quite clear.

Mr. Justice Story does not seem, in his Commentaries on Equity Jurisprudence, to have traced its origin, or stated the progress of this jurisdiction. After stating that courts of equity do not assert any general jurisdiction to decree a suitable maintenance for the wife out of the husband's property, because he has deserted her, &c., he says : " Whenever the wife has any equitable property within the reach of the jurisdiction of courts of equity, they will lay hold of it ; and in such case of the desertion or ill treatment of

the wife by the husband, as well as in the case of his inability or refusal to maintain her, they will decree her a suitable maintenance, out of such equitable funds. The general ground on which this jurisdiction is asserted, is, that the law, when it gives the property of the wife to the husband, imposes on him the correspondent obligation of maintaining her, and that obligation will fasten itself upon such equitable property, in the nature of a lien, or trust, which a court of equity, when necessary, will, in pursuance of its duty, enforce." 2 *Story's Eq.* 650.

Here the jurisdiction is placed upon the ground that the obligation of the husband to maintain the wife fastens itself upon the equitable property, in the nature of a lien or trust. But that obligation is equally imperative whether she have any property or not, and might equally well fasten itself upon his estate, however acquired.

In another place, speaking of the maxim that he who seeks equity must do equity, he gives, as one of the illustrations and instances in which it will be applied,—where a husband seeks to recover his wife's property, and he has made no settlement upon her. 1 *Story's Eq.* 78.

It would seem that this jurisdiction to provide for the wife's maintenance out of her equitable interests, in case of desertion, and also for a settlement to be made upon her, out of her equitable interests, where no desertion existed, had its origin in this maxim.

Thus in *Nichols* vs. *Danvers & e contra*—A wife having been used with cruelty by her husband, became entitled to a share of her mother's personal estate, who died intestate. The interest was decreed to the wife, for her separate use, and then to the husband if he survived ; afterwards the principal to be paid to the issue, and if no issue, then to the survivor of the husband and wife. 2 *Vern.* 671. In Mr. Raithby's note it appears that the decree recited as a ground for it, " the defendant being obliged to come into equity for the same," and proceeded upon that ground. A special

agreement was mentioned and supposed to be the ground by Lord Ellenborough. 2 *East* 283—294. So in *Williams* vs. *Callow & e contra*, the husband brought a bill and the wife a cross bill. It was a case of cruelty, and the husband was wasting his substance. 2 *Vern.* 752. So in *Oxenden* vs. *Oxenden & e contra*, the husband having by his cruelty forced his wife to separate from him; Lady Oxenden's bill was to have a marriage agreement performed, and an allowance for maintenance. Sir James' cross bill was to have part of the wife's portion invested, &c. The Lord Keeper, Wright, said that as a court of equity will oblige a husband who comes into equity for his wife's portion, to make a settlement upon the wife, by way of jointure, or to secure a maintenance to her in case she outlive the husband, the court ought much rather to do it where the wife is at present reduced to a starving condition, and especially where, as in this case, the execution of a trust is to be directed by the court. 2 *Vern.* 493.

It seems that in *Colemore* vs. *Colemore*, before Lord Chancellor King, the husband had, after a sentence for alimony, made over his whole estate to trustees, and then went to the West Indies; and upon a bill, brought by the wife against the trustees, he directed them to pay her a considerable maintenance out of the trust estate, whilst the husband resided abroad. *Vide the case cited* 3 *Atk.* 295. That case was after a divorce, and decree of alimony, and for the purpose of securing the wife's maintenance, because the husband attempted to evade the payment of the alimony. It seems to have been a mode of enforcing the decree for alimony.

But in *Watkyns* vs. *Watkyns*, 2 *Atk.* 96, where the wife brought a bill for maintenance, on suggestion of cruel usage, Lord Hardwick said: "I can do no more in this case than Lord Chancellor King did in the case of Colemore and Colemore, when he framed his decree by way of analogy to the writ of *ne exeat regno*, and impounded the fortune of the hus-

band, for the wife's maintenance, until his return;" and he referred it to a master, to take an account of the personal estate of the plaintiff before her marriage, which had come to the hands of the defendant since her marriage, &c. And as the husband had possessed himself of his wife's fortune, and gone out of the kingdom, he ordered the interest of a certain sum to be paid to her until he thought proper to return and maintain her.

This is the first case that I find where the court departed from the principle that they could not interfere except where the husband sought the aid of the court; and this was assumed by analogy to a case where the husband attempted to avoid a decree of the ecclesiastical court for the payment of alimony. Mr. Saunders, the editor, says, in a note— " But notwithstanding this case, and that of Williams vs. Callow, 2 Vern. 752, it seems that the court of chancery cannot compel the husband to pay a separate maintenance to the wife, unless upon an agreement between them, or after a divorce in the ecclesiastical court." He refers to *Head* vs. *Head*, 3 *Atk.* 547—550, and 1 *Fonblanque's Equity* 96.

Head vs. Head was a bill by the wife, against the husband, to establish her separate maintenance. Lord Hardwick said : " The two principal grounds for bills of this kind are an agreement for maintenance, or a trust for this purpose ; and in either of these cases the court will entertain a suit for alimony and maintenance, and even after a sentence in the ecclesiastical court for it, where the husband in order to evade it is going out of the kingdom, will, upon a bill filed by the wife, grant a *ne exeat regno ;*" and he then refers to *Colemore* vs. *Colemore*, 3 *Atk.* 295.

Since the time of Watkyns vs. Watkyns, the principle upon which the court will provide for the maintenance of the wife seems not to have been confined to cases where the husband sought the aid of the court, but has been enlarging from time to time.

Parsons
*vs.*
Parsons et al.

In *Sleech* vs. *Thorington*, 2 *Ves.*, *sen.*, 562, Sir Thomas Clark, M. R., in delivering the opinion, says: "In general, where a husband comes into court for the wife's property, or any thing he claims in her right, *jure mariti*, he is obliged to submit to the terms of the court, and make a settlement, or reasonable provision out of that. Various instances have been, where the wife has insisted the husband should have nothing ; the court has not thought itself empowered to take from the husband the wife's fortune, so long as he is willing to live with and maintain her, and no reason for their living apart : even where the husband will not come in before the master, the court will not go so far as to do any thing in diminution of the husband's right so as to take away the produce from him, or prevent his receiving the interest, but constantly, where he maintains the wife, accompanies the direction for a suspension, with payment of the interest to the husband. It is otherwise where he leaves her unprovided ; Colmer vs. Colmer, by Lord King. But more particularly in Watkyns vs. Watkyns, Dec. 10, 1740, where exactly like this case the husband was gone abroad, and left his wife unprovided for, the court laid hands on the money which was in the power of the court, and directed the payment of the interest to the wife, until the husband returned and made provision for her, as he ought."

"In the power of the court," here, must mean 'within the kingdom,' for the husband had in that case reduced the property into possession, and it was in no other way in the power of the court, until, as the Master of the Rolls expresses it, "the court laid hands" upon it.

It is apparent that this laid a broad foundation as the basis of the jurisdiction ; for if the husband deserted the wife, and left the kingdom, leaving property which had come in right of the wife, (although he had reduced it to possession, according to the case of Watkyns vs. Watkyns,) the court might interfere, on her application.

Subsequent cases placed the jurisdiction of the court on the original ground.

In *Pryor* vs. *Hill*, 4 *Brown's Ch. Rep.* 143, where the husband had made a general assignment for the benefit of creditors, and the wife, being entitled to the interest of funds for life, the assignees brought a bill to be paid the interest and dividends, Sir Richard Pepper Arden, the Master of the Rolls, recognized the original principle.   He said : " If the parties cannot agree, I can only say I cannot assist the assignees to get it without their making a provision."   And in *Burdon* vs. *Dean*, 2 *Ves., Jr.*, 606, which was a bill by the assignees of the husband, who was a bankrupt, he said, " the next question is, whether the plaintiffs can get any thing without the intervention of this court."   " I have no objection to what they can get at law ; but if they come into this court, I will not extend the arm of the court to give them any other part of her property without a consideration for it."

But in *Wright* vs. *Morley* and *Morley* vs. *St. Alban*, 11 *Ves.* 12, 23, the Master of the Rolls, Sir William Grant, cited Watkyns vs. Watkyns, and other cases which have been referred to, and held that if the husband has gone abroad, and left the wife unprovided for, a decree might be made to pay her dividends on stock held in trust for her.   And in *Duncan* vs. *Duncan*, 19 *Ves.* 395, he said, " the cases in which subsistence has been provided by the court are, either where the husband has turned her" (the wife) " out of doors, or by ill treatment obliged her to leave his house, or had quitted the kingdom leaving her destitute ;" and he cited, among other cases, Watkyns vs. Watkyns, Sleech vs. Thorington, &c.

It may be taken to be now settled in the English court of chancery, that a bill in behalf of the wife will be sustained in such cases.   Clancy, treating of the equity of a married woman to a provision out of her equitable interests, where she had been abandoned or ill treated by her husband, says : " The nature of this equitable relief is this, that whenever

a husband abandons his wife, and leaves her without the means of subsistence, or else where he treats her so ill as to force her to quit his house, in either of these events if she file a bill by her next friend against him, praying that an allowance may be secured to her out of the produce of her own fortune which is in the power of the court, a decree will be made according to this prayer. But the dispensation of this favor on such occasions arises wholly from the wife's fortune which the court has within its reach; her maintenance must, if at all, be served out of that; for without it equity has no jurisdiction to interfere, and the wife must go without redress. Whatever the nature and extent of her sufferings may have been; whether she has been left by her husband destitute of the means of support, or has been driven from her home by the cruelty or violence of his demeanor towards her; however large her portion may have been, if he have reduced it into possession, or if it be of a legal quality, equity can give her no relief, as neither the person nor the property of the husband can be made liable in that court to a maintenance for his wife under such circumstances." *Clancy's Rights, &c., of Husband and Wife* 447.

It is clear, from this examination of the cases, that this jurisdiction is not maintained upon the ground merely of a trust which the court has power to enforce, but it is a separate branch of equity, and it is, in the elementary writers, denominated the wife's equity to a provision or maintenance.

The changes in this branch of equity jurisprudence have but followed, or accompanied, the changes respecting the wife's equity to settlement out of her estate.

The nature of this equity to a settlement is thus stated by Mr. Clancy.—" If a husband, or any person claiming in his right, seeks to reduce into possession that part of the wife's portion which is of an equitable nature, chancery will in most instances insist on a provision for her out of it,

where no settlement or an inadequate settlement has been made upon her. If the wife's fortune be within the reach of the court, as,—if it were vested in trustees, or if it have been paid by the trustees into court, or if it be in any other situation in which it would be under the direction and control of a court of equity, that court will not suffer it to be removed out of its jurisdiction until an adequate provision shall be made for her, unless she has been already sufficiently provided for, or unless, on her personal examination, she waives the benefit of this protection ; and this is called 'the wife's equity.'" *Clancy* 441.

In *Micoe* vs. *Powell et ux. et a.*, 1 *Vernon* 37, an infant, entitled to the trust of lands in fee, married without the consent of the father. The father brought a bill against the husband and wife and her trustees, that a provision might be made for her out of these lands. The husband and wife demurred to the bill, and the demurrer was allowed by Lord Chancellor Nottingham. " But he said if Mr. Powell had been plaintiff here in chancery, to have the trustees transfer their estate, or for any other favor of the court, then, indeed, when he had such a hand upon Mr. Powell, he could make him do such things as should be reasonable."

And in *Lupton et ux.* vs. *Tempest*, 2 *Vern.* 626, the trustees asking that the husband should make a settlement, Lord Chancellor Cowper said—" Where husband and wife join and demand execution of a trust of real estate, it must be decreed according to the will, because the wife demands it. But where a husband comes for a personal demand in the right of his wife, or for raising a sum of money, there the court may impose terms on the husband, as being in diminution of the husband's right."

So in *Milner* vs. *Colmer*, 2 *P. Wms.* 639, the husband had applied to the court for his wife's portion ; and the court, on application of his wife's mother, directed him to lay proposals for a settlement before a master. In that case Lord Chancellor King said, " he thought it extraordinary that this

court should interpose against the husband, in cases where the law gives him a title to the wife's personal estate," &c.

In *Adams* vs. *Pierce*, 3 *P. Wms.* 11, the plaintiff, who was executor in trust, brought the bill to pass his own accounts, and that the husbands of two daughters of the testator, who were his residuary legatees, might make additional settlements, Lord Chancellor Macclesfield said, " the executor here is plaintiff and not the husbands ; if the latter had asked any aid in equity, the court would have refused granting it but on such terms as should appear reasonable."

In *Brown and wife* vs. *Elton*, 3 *P. Wms.* 202, the husband demanded the legacy, but the executor refused to pay unless some settlement or provision were made for the lady, and the husband with his wife brought the bill. It was urged for the defendant that those who would have equity ought to do equity, &c. Lord Chan. King said : " I found it to be the practice, at my coming into this court, to enforce the husband, before he recovers by the aid of equity his wife's portion, to make a settlement ; and as such practice has so long obtained, I shall not at this time take upon me to alter it, although it seems to break in upon the legal title which the husband has to the wife's personal estate," &c.

So in *Bond* vs. *Simmons*, 3 *Atk.* 19, the husband had brought a bill for the legacy to his wife, and refused to make a settlement.

It is not necessary at this time to trace the cases farther. The change is shown by the following paragraphs from Mr. Clancy's treatise.

" When it is said that a court of equity will insist on a provision for a married woman out of her equitable interests, it is not to be understood that where she has property of that nature a provision will at all events be enforced for her ; for in fact a court of equity has no power of exacting a settlement for a married woman out of this part of her portion, unless her husband, or some person claiming through him, seeks to acquire the possession of it. For if the hus-

band does not require the possession of his wife's fortune, and will be content with the interest of it, to which he has a right so long as he maintains her, he cannot be obliged to make any settlement upon her." *Clancy* 445. "At first, indeed, this equity was administered only in cases where the husband required the assistance of the court to get the possession of his wife's fortune ; and the reason then given for putting him under terms in such a case, was that as he sought equity he must do equity. But now this protection is extended to all instances where the equitable interests of the wife are the object of the suit, whether the court be applied to by the husband or his assignees, to obtain the possession of them, or by the wife or her trustees, or by any other person on her behalf, praying for a provision for her out of them." *Clancy* 446. *Vide, also,* 452, 453, 472, 474.

Judge Story says : " The principal, if not the sole cases, in which courts of equity now interfere to secure the wife her equity to a settlement are, first, where the husband seeks aid or relief in regard to her property ; secondly, where he makes an assignment of her equitable interests; thirdly, where she seeks the like relief as plaintiff against her husband or his assignees in regard to her equitable interests." 2 *Story's Eq.* 633.

The last class may well, in effect, include the two former ; for if she may proceed against him, or his assignees, in all cases, it covers the whole ground. The paragraph shows the progress of the jurisdiction.

The cases in New-York have followed the practice in England. 2 *Johns. Ch. Rep.* 206, *Howard et ux.* vs. *Moffat ;* 5 *Johns. Ch. Rep.* 464, *Kenny* vs. *Udall ;* 3 *Cowen* 590, *S. C. ;* 6 *Johns. Ch. Rep.* 25, 178, *Haviland* vs. *Bloom & Myers ; and* 4 *Paige's Ch. Rep.* 74, *Van Epps* vs. *Van Deusen.* In the first of these cases the rule is stated—" If the husband can lay hold of the property without the aid of a court of equity, he may do it ; the court has not the means of enforcing a settlement by interfering

with his remedies at law." But in *Kenny* vs. *Udall,* Chancellor Kent said : " It is now understood to be settled, that the wife's equity attaches upon her personal property when it is subject to the jurisdiction of the court, and is the object of the suit, into whosesoever hands it may have come, or in whatever manner it may have been transferred. The same rule applies, whether the application be by the husband or his representatives or assignees to obtain possession of the property, or whether it be by the wife or her trustee, or by any person partaking of that character, praying for a provision out of that property." In 2 *Kent's Com.* 119, (1 *Ed.*) he inclines to the opinion that the claim attaches only on that part of the wife's personal fortune which the husband cannot acquire without the aid of a court of equity ; and that if he can acquire possession of it without a suit at law or in equity, or by a suit at law without the aid of chancery, (except, perhaps, as to legacies and portions by will or inheritance) the husband will not be disturbed in the exercise of that right. But in *Van Epps* vs. *Van Deusen,* Chancellor Walworth says : " If the wife is entitled to such an equity upon a bill filed by a husband or his assignee, or by a third person, as all the cases upon this subject admit, I can see no valid objection in principle against granting her similar relief where the husband, or the general assignee in bankruptcy, is endeavoring to deprive her of that equity by an unconscientious proceeding at law."

The court of chancery in England has interfered to restrain the husband from proceeding to recover a legacy to the wife. 2 *Story's Eq.* 632, *and note; Toller on Exrs.* 490 ; *Clancy* 443, *& cases cited.* And Mr. Clancy contends that " the same jurisdiction should restrain the husband from availing himself of any means, either at law or in equity, of possessing himself of the wife's legal choses in action without making a competent provision for her ;" and some of the cases certainly countenance such an application of it. *Clancy* 468.

It is said that equity "does not controvert the legal title of the husband to his wife's personalty, and to the rents and profits of her real estate during her life; on the contrary, it admits the law upon the subject to its fullest extent; for if he have once acquired the possession of that property, though it had been of an equitable nature, this court will leave him in the undisturbed enjoyment of it. Before a suit has been instituted to enforce the claims of the wife, the husband may, if he can, get her property into his hands, and her trustee may, if he thinks fit, give that property to him, and the court will not interfere." *Clancy* 442; *Story's Eq.* 631. But according to the case Watkyns vs. Watkyns, before cited, the court will interfere in some cases where the husband has obtained possession.

If we sustain this bill, and direct or provide for an allowance to the wife out of her share in the estate of her father, on the ground of a trust, and because the wife has been deserted, we must also, upon application, provide for a settlement upon a wife out of her equitable interests, where there has been no desertion.

Mr. Clancy states the difference between the two cases, but there is no difference which can make a distinction in this respect. He says: "The provision which is secured to a married woman under the circumstance of desertion or ill treatment by her husband, resembles both the wife's equity and her separate property, though in fact it is substantially different from both. It is like her separate property, because it is payable to her separately and distinctly from her husband; but then it is unlike separate property in this respect, that she has not the complete command of it, as she cannot anticipate the future gales by a sale or other disposal of it, but must wait until they become due. It is like the wife's equity, because it is an arrangement by the court for her security resulting from her equitable interests; but it is unlike the wife's equity, because it is always a present income during the husband's life, and intended to

relieve immediate necessities ; whereas the wife's equity is future, and is intended not as the means of present support, but as the security for a future subsistence after the husband's death, except, indeed, he becomes incompetent to support her, by bankruptcy or insolvency, and then indeed it is a present provision.    There is this further difference between this separate maintenance and the wife's equity, that the former continues only until the husband returns to his duty, and conducts himself towards her as he ought, while the latter continues from the period of its commencement until the death of the wife.    And nothing can more strongly evince the vigilance of a court of equity in the interests of married women, than the enforcement of these provisions ; for by such arrangements a settlement may be secured to her out of her fortune, not only after her husband's death, but even during his life time, if it should be expedient for her,—thus guarding her against the possibility of future danger, and applying a remedy for her present wants." *Clancy* 448.

It is apparent from this, that so far as the right and the duty of the court to interfere in behalf of the wife are concerned, the two classes of cases are alike.    There is the same kind of equitable property as the foundation in both cases—there is in both an arrangement by the court for her security, resulting from her equitable interests—and in both cases it is intended as a provision for her, although it may in some cases extend to her children.    The difference is, that in one case the provision is intended for present support, and may cease when he provides ; in the other it is intended for future maintenance, but may, if he fails to support her, from insolvency, be a present provision.

It is useless to attempt to sustain this jurisdiction upon the ground of enforcing a trust properly so called.

Judge Story, speaking of the wife's equity to a settlement, says : " It is not easy to ascertain the precise origin of this right of the wife, or the precise grounds upon which

it was first established.    It has been said that it is an equity, grounded upon natural justice ; that it is that kind of parental care which a court of equity exercises for the benefit of orphans, and that as a father would not have married his daughter without insisting upon some provision, so a court of equity, which stands in *loco parentis*, will insist upon it. This is not so much a statement of the origin as it is of the effect and value of the jurisdiction.    The truth seems to be that its origin cannot be traced to any distinct source.    It is the creature of a court of equity, and stands upon its own peculiar doctrine and practice.    It is in vain to attempt, by general reasoning, to ascertain the nature or extent of the doctrine, and therefore we must look entirely to the practice of the court for its proper foundation and exercise." 2 *Story's Eq.* 635 ; *vide, also,* 636.

There is here no suggestion that it originates or can be supported on the ground of enforcing a trust ; and over this "creature of a court of equity" thus originating from its practice, our statute has given us no jurisdiction.

In Pennsylvania, where the common law courts exercise some equity powers, the supreme court came to the conclusion that they did not possess such a power.    1 *Binn.* 358, *Yohe* vs. *Barnet.*    Chief Justice Tilghman said : "It is to be regretted that the courts in this state are not vested with the power, exercised by the courts of chancery in England, of insisting on some provision for the wife, where the husband applies to them for the purpose of getting possession of her personal property.    But we have no trace of any such exercise of power by our courts.    It must be taken for granted, then, that they possess no such power."

It is not from any particular admiration of the rules of the common law in this respect, that we have come to the conclusion that we have not jurisdiction in the present case.    Could we find a sound principle on which to interfere in behalf of this plaintiff, we should most cheerfully do so, on such a case as is stated in her bill.

It may be very desirable that the legislature should make further provisions, securing to wives some interest in the personal property which they may have on the marriage, or which may accrue to them afterwards. Many a case of great hardship has arisen from the improvidence, or iniquity, and desertion of the husband; but in the present state of our law we cannot assert a general jurisdiction to require a settlement, or provide for a maintenance.

If the husband or his assignee shall have occasion for the aid of the court, to enable him to obtain possession of the distributive share of the plaintiff, perhaps we may apply the principle that he who asks equity must do equity, and require him to make provision for her support out of the fund, before we aid him in recovering it. This principle may well be applied in the exercise of any chancery powers we possess, and perhaps in any case where it would be necessary to proceed in chancery in England, but where the party may here, by our practice, proceed at law. But we cannot deduce from it an original jurisdiction not conferred by the statute.