*The reference law of 1874—Unconstitutionality of that portion of the act making the report of the referee evidence on trial of the cause by jury.*

That part of sec. 13, ch. 97, of the Laws of 1874, which provides that upon the trial by jury of a cause which has been referred under the act, "the report of the referee shall be evidence of all the facts stated therein, subject to be impeached," and so much of sec. 3, ch. 35, of the Laws of 1875, as makes provision to the same effect, are unconstitutional and void.— CUSHING, C. J., dissenting.

FROM HILLSBOROUGH CIRCUIT COURT.

CASE, for flowing the plaintiff's land. Verdict for the defendant. The case was referred by order of the court, at a previous term, to a referee, under the statute of 1874, whose report, in the defendant's favor, was offered in evidence by the defendant, and admitted against the plaintiff's objection. The plaintiff excepted to the ruling admitting the same, upon the ground that said statute making such report evidence for the jury is in that respect unconstitutional.

The plaintiff moved to set aside the verdict, and for a new trial for supposed error in the foregoing ruling.

*Wadleigh & Wallace,* for the plaintiff.

1. The statute of 1874, making the report of the referee evidence, is in contradiction of Art. 20 of the Bill of Rights, giving parties a "right to a trial by jury, except in cases in which it has been heretofore otherwise used and practised," and providing that that "method of procedure shall be held sacred." It will not be seriously contended that actions of this kind were tried otherwise than by jury before the adoption of the constitution. The arbitrary acts of royal governors, who were encouraged by colonial weakness to usurp powers which, if assumed in England by the king himself, would have cost him his head or his crown, prove nothing to the contrary. The elevation of unlearned men to the bench in the rude infancy of the state, and their sayings (as ridiculous as the attempt to lug them into this case), are entirely irrelevant.

What is the jury trial to which the plaintiff is entitled, and the method of procedure which is to be held sacred? It is a trial by a jury of twelve men, according to the course of the common law. The decision of twelve men is not the verdict of a jury, unless they act as a

separate and independent tribunal in judging of the facts. The province of the court at common law is simply to instruct the jury relative to the law involved in the trial. Was there ever any one mad enough to suppose that the court, or any person appointed by it, could decide what the verdict should be, and that the jury could be compelled to receive and consider such decision as evidence? That is the effect of the statute of 1874. It makes the verdict not the independent judgment and conclusion of the jury upon the facts, but simply a decision whether another tribunal decided correctly or not. It vastly extends the authority of judges; it destroys the independence of juries. Plain men, compelled to receive as evidence and pass upon the decision of another tribunal appointed by the court, brought together for the first time, and having no *esprit du corps*, having little knowledge of the law, venerating the forms and ministers of justice, and embarrassed by the novelty of their position, will generally modestly surrender their own convictions to the majesty of the bench, or to the wide reputation and extensive influence of lawyers appointed for the express purpose of determining cases without jury trial.

The statute of 1874 is a gross violation not only of our rights as American citizens, but also of the ancient privileges conferred by Magna Charta upon all freemen living under the common law. It is an indication that power, as is its wont, is stealing from the many to the few. He was a wise man who said that English liberty consisted in getting twelve good men into a jury-box. What would Erskine have said, what would Englishmen have done, if an act of parliament had compelled juries to receive the decisions of even Lord MANSFIELD'S appointees as evidence? An act conferring such powers upon English judges would have been met by the indignant protest of every intelligent Englishman who was not a servile tool of government, would have overthrown any administration that supported it, and, if not repealed, would have led to revolution.

The act of 1874 was a long step towards practical abolition of trial by jury. It was passed in haste and without consideration. If it had been debated, it could not have been passed. It tempts the judges with powers never held by the bench where the common law prevails; but we cannot doubt that those powers will be rejected if they infringe upon the constitutional rights of juries, and of parties. See *Plimpton* v. *Somerset*, 33 Vt. 283.

2. The defendant's counsel have sought to link the auditor law to the act of 1874, and to place them on the same ground. They stand on entirely different grounds, in their main features. In the old action of account, after a judgment *quod computet*, auditors were appointed to take and declare the account to the court. In modern practice the action of assumpsit has superseded that of account. The statute provides for the appointment of auditors only in cases where the action of account would lie. Such cases may not come within the provisions of the Bill of Rights, as before the adoption of the constitution they were decided by auditors and not by juries.

*Morrison & Hiland* (with whom were *Cross & Burnham*), for the defendant.

The exception is to the report of the referee as competent evidence for the consideration of the jury, as provided in the act of 1874, on the ground that it is repugnant to Article 20 of the Bill of Rights, securing the right of trial by jury, and Article 23 of the same, guarding against the passage of retrospective laws as highly injurious, oppressive, and unjust. We say it is not repugnant to either.

Article 20 of the Bill of Rights provides for a trial by jury, except in cases in which it has heretofore otherwise been used and practised. What was the trial by jury under the constitution of 1792, how were such trials conducted, and what were the rules of evidence, if any, as understood by the convention that framed it and the people who adopted it? We have no early decisions upon which we can rely in reference thereto, and can only refer to history for such light as it throws upon the subject. Under the colonial government, a decisive trial by jury in civil causes was substantially denied in all important cases; as, after trial by court and jury, they were carried up for decision to the governor and council, and with the right, in certain cases, of an appeal to the king in council for final determination. The governor and council were not generally lawyers, and were not much influenced in their decisions by any known principles of established law. An act passed July 5, 1776, established a superior court of judicature, court of common pleas, etc. The judges of the superior court of judicature, appointed under said act, were Meshech Weare, Dr. Matthew Thornton,—neither of them lawyers,— and John Wentworth, a lawyer, but not much distinguished in the profession. These three constituted the court until 1782, when Samuel Livermore, a lawyer, was appointed chief-justice, who held the office until 1790. He paid little attention to precedent, and was even known to caution a jury against paying too much attention to the niceties of the law to the prejudice of justice. Once, when reminded of his previous decision in a similar case, his reply was,—" Every tub must stand on its own bottom." Under the constitution of 1784 the same courts were reorganized and continued, and Livermore was succeeded by Josiah Bartlett, not a lawyer, who in turn was succeeded by John Pickering, a lawyer, Pickering holding the office until 1795. It does not appear that previous to 1795 there was at any time a majority of lawyers on the bench, or that the judges had or exercised equity or chancery powers. Of the associate justices were John Dudley, a trader, and Timothy Farrar, not a lawyer. Of the court, as thus constituted, Judge SMITH, in 1796, said,—" There are now two lawyers on the bench, but I think they are by no means the best of the four. Farrar and Dudley, in my judgment, greatly outweigh them." And of Judge DUDLEY, Theophilus Parsons said,—" He is the best judge I ever knew in New Hampshire." Dudley's idea of law may be inferred from one of his charges to a jury, which we copy from the life of William Plumer, to which work, by the way, we are indebted for many of

the foregoing facts. In concluding his charge, Judge DUDLEY said,— " You have heard, gentlemen of the jury, what has been said in this case by the lawyers—the rascals! But, no, I will not abuse them. It is their business to make a good case for their clients. They are paid for it, and they have done in this case well enough. But you and I, gentlemen, have something else to consider. They talk of law. Why, gentlemen, it is not law that we want, but justice. They would govern us by the common law of England. Trust me, gentlemen, common-sense is a much safer guide for us—the common-sense of Raymond, Epping, Exeter, and the other towns which have sent us here to try this case between two of our neighbors. A clear head and an honest heart are worth more than all the law of the lawyers. There was one good thing said at the bar. It was from Shakespeare, an English player, I believe. No matter; it is good enough almost to be in the Bible. It is this : ' Be just, and fear not.' That, gentlemen, is law enough in this case, and law enough in any case. ' Be just, and fear not.' It is our business to do justice between the parties. Not by any quirk of the law out of Coke or Blackstone, books that I never read and never will, but by common-sense and common honesty, as between man and man. That is our business, and the curse of God is upon us if we neglect, or evade, or turn from it. And now, Mr. Sheriff, take out the jury ; and you, Mr. Foreman, do not keep us waiting with idle talk, of which there has been too much already, about matters which have nothing to do with the case. Give us an honest verdict, of which, as plain common-sense men, you need not be ashamed."

The last judge appointed on the bench of the superior court, who was not a lawyer, was Richard Evans, appointed in 1809, and removed in 1813. Wherefore it is shown that there were no fixed rules of evidence governing the practice in our courts previous to 1792, or for several years after.

No brief having been furnished us by the plaintiff, we will proceed to answer as we may be able his supposed objections to the law, i. e., to making the report of a referee evidence before the jury on the ground of its unconstitutionality.

No law is constitutional which is retrospective, which impairs vested rights, or which imposes or attaches a penalty to the right of trial by jury as it existed in 1792, though that right was then so indefinite and uncertain ; but one affecting remedies alone is clearly constitutional.

First, let us look at the decisions, and see what our courts hold to be retrospective laws, as affecting vested rights in contradistinction to remedies. In no view can the law making the report of the referee evidence for the consideration of the jury be deemed retrospective in the meaning of that term as used in Article 23 of our Bill of Rights. The legislature has an undoubted right to prescribe what shall and what shall not be evidence, even for the consideration of a jury. They have often exercised that right unquestioned ; as, for instance, in allowing parties to testify in their own behalf, in relation to auditors, etc. In one view, all laws are retrospective during and in regard to the genera-

tion passing the same. The game laws could not be enforced if it were held that a party violating the same should be tried only upon the facts and the evidence in support thereof which existed when he acquired the right to hunt in our woods and fish in our waters, *i. e.*, at his birth. And it would be absurd to claim that our game laws are retrospective. Such a holding would be to the effect that every individual should be amenable only to such laws as existed at the moment of his birth. In *Rich* v. *Flanders*, 39 N. H. 304, the court hold that the word "retrospective," as used in our Bill of Rights, is a technical term, and is not to be used in a literal sense, and that statutes affecting the remedy only, though in fact retroactive, are not considered retrospective. And although BELL, C. J., dissented in that opinion, in *Willard* v. *Harvey*, 24 N. H. 351, he says,—" Courts have everywhere recognized a distinction between statutes affecting rights, and those affecting remedies only. The rights of parties cannot be changed by legislation, but no party has a vested right in any particular remedy." He continues : " Courts may be changed, one may be abolished and another substituted, or the jurisdiction may be transferred ; the process may be changed, as by abolishing arrests for debt; new parties may be authorized to bring suits, as executors, heirs, assignees, etc. ; the action may be changed, as by substituting case for debt, or trespass, or proceedings at law for those in equity, or *vice versa ;* new rules of evidence or practice may be established; new final process may be established or substituted ; new modes of executing such process or of preserving their lien ; new exemptions of property ; and new modes of relief from imprisonment may be provided;—and of none of these things has a party any right to complain as a violation of the constitution so long as the laws leave to him a competent court, bound to administer justice to him according to the rights the law gave him when his right of action or defence became vested." In support of these positions the learned chief-justice cites, among others, *Springfield* v. *Commissioners*, 6 Pick. 500 ; *Com.* v. *Phillips*, 11 Pick. 28 ; *Hope* v. *Johnson*, 2 Yerg. 125 ; *Gray* v. *Munroe*, 1 McLean 528 ; *Woodfin* v. *Hooper*, 1 Humph. 13; *Fisher* v. *Lackey*, 6 Blackf. 373 ; *Bank* v. *Longworth*, 1 McLean 35 ; *Harlan* v. *Sigler*, 1 Mor. 39 ; *Paschall* v. *Whitsett*, 11 Ala. 472 ; *Bartlett* v. *Lang*, 2 Ala. 401 ; *Woods* v. *Bruce*, 5 How. (Miss.) 285 ; *Ballard* v. *Ridgley*, 1 Mor. 27 ; *Inghram* v. *Dooley*, 1 Mor. 28 ; *McMillan* v. *Sprague*, 4 How. (Miss.) 647 ; *Bemis* v. *Clark*, 11 Pick. 452 ; *Sommers* v. *Johnson*, 4 Ver. 278; *Tripler* v. *Hanson*, 3 Sand. 310 ; *Newton* v. *Tibbatts*, 2 Eng. 150; *Bronson* v. *Newberry*, 2 Doug. 38. And in *Springfield* v. *Commissioners*, PARKER, C. J., observes,—" There is no such thing as a vested right in any particular remedy." The case of *Lewis* v. *Foster*, 1 N. H. 61, decided by the same generation of men that adopted our constitution, and perfectly familiar with the intention of its framers and cognizant of what was intended by retrospective laws there prohibited, was where an action of debt was brought to recover a penalty given by statute. The plaintiff recovered judgment, the statute was then repealed, and the defendant reviewed the action.

The court, RICHARDSON, C. J., held that the repeal took away the plaintiff's right of action, and gave a judgment for the defendant upon review.

The same doctrine has been held by the courts of Maine. SHEPLEY, J., in *Oriental Bank* v. *Freeze*, 18 Me. 109, held that the legislature might pass laws that act retrospectively, not on the right of property or obligation of the contract, but upon the remedy which the laws afford to protect and enforce them. " And in doing this," he continues, " one may be deprived of a right which he has by existing laws to arrest the body or to attach or seize a certain description of property, without infringing any constitutional provision." And in *Fales* v. *Wardsworth*, 23 Me. 553, WHITMAN, C. J., says that the legislature may prescribe what shall and what shall not be evidence of a fact, and it makes no difference whether it be in relation to contracts existing at the time or prospectively ;—see, also, *Thayer* v. *Seavey*, 2 Fair. 284, and *Read* v. *Bank*, 10 Shep. 318.

The same rule of law also obtains in Massachusetts. In *Kendall* v. *Kingston*, before cited, PARSONS, C. J. (no mean authority), says,— " Certainly the legislature may prescribe, and frequently have prescribed, rules of evidence by which parties must support their acknowledged rights." In *Knight* v. *Dorr*, 19 Pick. 48, while the action was pending, and before judgment therein, a statute was passed changing the law, and allowing the plaintiff who sues on a joint contract to take judgment against a part of the joint contractors, although he fail to establish his claim against the whole. The law was held to be constitutional, MORTON, J., observing,—" The statute, in terms, applies to pending as well as prospective suits, to past as well as to future causes of action ; and as it relates to the remedy and not the right, it is not objectionable as impairing vested rights or the obligation of contracts." *Reed* v. *Fullum*, 2 Pick. 158, was an action of debt against a surety on a bail bond, conditioned that the principal in the bond should " not depart without the exterior bounds of the debtors' liberties " until he should be lawfully discharged. When the bond was given, the " debtors' liberties " included the entire county. Afterwards a statute was enacted narrowing the " debtors' liberties ; " and after the passage of the statute, and before he was lawfully discharged, the debtor departed without the exterior bounds as they were thus created, but not outside the limits as they were when the bond was given. In vain did the surety contend that the bond which he signed was in fact conditioned that the debtor should not go outside the county, and that it had not been violated. The court, LINCOLN, J., held that the statute narrowing the limits was not unconstitutional as impairing vested rights, and the surety upon the bond was held liable ;—see, also, *Holbrook* v. *Finney*, 4 Mass. 566, *Foster* v. *Bank*, 16 Mass. 245, *West* v. *West*, 2 Mass. 222, *Wales* v. *Belcher*, 3 Pick. 508, *Holyoke* v. *Haskins*, 9 Pick. 259, *Loomis* v. *Ives*, 15 Pick. 435, *Wilbur* v. *Gilmore*, 21 Pick. 250, and *Lane, Apt.*, 3 Met. 213. In New York, *Stocking* v. *Hunt*, 3 Denio 274, the same doctrine was held to be undisputed law.

And in the supreme court of the United States, in *Ogden* v. *Saunders*, 12 Wheat. 349, MARSHALL, C. J., says,—" In prescribing the evidence which shall be received in its courts, and the effect of that evidence, the state is exercising its acknowledged powers. It is likewise in the exercise of its legitimate powers when it is regulating the remedy and mode of proceedings in its courts;"—see, also, *Crawford* v. *Bank*, 7 How. (U. S.) 279.

Chancellor KENT (1 Commentaries 455) says—"A retrospective statute affecting and changing vested rights is generally considered in this country as founded on unconstitutional principles, and consequently inoperative and void; but this doctrine is not understood to apply to remedial statutes which may be of a retrospective nature, provided they do not impair contracts or disturb absolute vested rights.    *    *    Such statutes have been held valid when clearly just and reasonable, and conducive to the general welfare, even although they might operate in a degree upon existing rights."

Take another instance in the law allowing parties to testify in their own behalf. The statute of 1857, which removed the disqualification of witnesses by reason of their interest, and enabled parties to testify for themselves, was held constitutional in *Rich* v. *Flanders*, before cited, in the enforcement of contracts made before its passage, as well as subsequent, and in suits pending as well as those afterwards brought.

Indirectly the testimony of parties to suits has been brought before the jury previously under the law of 1823, authorizing the appointment of auditors in certain cases. The case of *Fuller* v. *Little*, 7 N. H. 535, was an action of assumpsit upon an account annexed. The case was sent to an auditor, who examined the plaintiff as the chief witness, upon whose evidence alone he allowed several items. The defendant objected. The court above, PARKER, C. J., remarked,—" The objection to the examination of the plaintiff as a witness in chief by the auditor is in the nature of a motion to set aside the report. But such motion cannot prevail in the case before us. The statute, giving the court power to appoint auditors, evidently contemplated the examination of the parties in some case, for it prescribes what course is to be pursued if any party shall refuse or neglect to render an account or produce such books or papers, or to answer on oath such interrogatories relating to the controversy as may be pertinent and material.    *    *    Any evidence that the statute allows is good evidence ; and auditors, therefore, may examine the parties, even if it appear that the articles were delivered to third persons, and give their testimony the weight to which it is entitled under the circumstances of the case." See *Stevens* v. *Hall*, 6 N. H. 508. This certainly goes far toward establishing the right of the legislature to prescribe rules of evidence. At that time the law allowing a party to testify in his own behalf had not been passed. A suit is brought upon a transaction to which there are but two witnesses—the plaintiff and the defendant. It is referred to an auditor, who hears the parties, and upon their evidence alone reports in favor

of the plaintiff. That makes out a *prima facie* case in his favor, and as the defendant has no evidence with which to impeach the report, he is powerless to oppose a judgment. The auditor law, therefore, indirectly brings the plaintiff's evidence before the jury, and, as the court says, rightfully. If that is not a retrospective law, we are at loss to see how it can be held that the referee law is.

In regard to the provisions of sec. 8, ch. 126, Gen. Stats. : There three appraisers are to be appointed by any justice of the peace to appraise any damage done by stray cattle that have been put in any pound, and the finding of any two of them is made conclusive upon the parties ;—and yet, unless the damages so assessed and the charges incurred, with the fees of the justice and the appraisers to be assessed by the justice, be paid in four days, the justice may proceed and sell the creatures so impounded. Thus, a man's horse may get loose, and do some damage, either on the highway or in the enclosure of a neighbor, and he has full authority to take the horse to the pound ; and if the owner does not pay such damages as may be assessed by three men, to be appointed by any justice of the peace in the state, together with the charges incurred and fees to the satisfaction of said justice, he loses his horse, for the justice may proceed at once and sell him. Where is his jury trial in this instance ? Instead of the damages being assessed by twelve men drawn from the entire county by due process of law, and governed by the established rules of law and evidence which the wisdom of ages has found to be just and equitable, he must submit to the caprice of three men, to be appointed by any one who happens to be in commission as justice of the peace ;—and yet, the constitutionality of that statute has never been questioned by the court, but has been acted upon and enforced by them. *Osgood* v. *Green*, 33 N. H. 318 ; *McIntire* v. *Marden*, 9 N. H. 288 ; *Bills* v. *Kinson*, 21 N. H. 448 ; *Kimball* v. *Adams*, 3 N. H. 182 ;—and in Maine, *Dunton* v. *Reed*, 5 Shep. 178.

And, to us, it is evident that the law, making the report of an auditor evidence before the jury, stands upon the same ground as the statute under consideration ; and we can but feel that they should stand or fall together. To say that the auditor law is constitutional, and that the referee law is not, seems forced ; and to oblige the court to go into refinements and speculations upon the existence or non-existence of equity courts in the state, at and prior to 1792, to take for a basis as true that upon which such men as Gov. Bell, Jerry Mason, Judge Parker, Judge Bell, and others, so widely differ, and to say that causes involving the examination of accounts and vouchers were at that time only to be heard in equity, or that if a jury trial was allowed in such causes it was only upon certain issues framed, and that the auditor in such cases becomes a constitutional method of pleading and of framing the issues, the real points of controversy for the jury to try,—such reasoning seems to us like seeking for an excuse rather than a reason, especially when we look at the class of cases that have been sent to auditors in this state and in Massachusetts, where the auditor law is

identical with ours, and the finding of the auditors, and the ruling upon their reports. *Bradley* v. *Clark*, 1 Cush. 295, was an action of account for the price of goods sold. The defence was, that the goods were taken in barter, to be paid for in other goods. The auditor passed upon all questions in controversy. *Lincoln* v. *Co.*, 9 Allen 181, was an action of tort, to recover for an injury to the plaintiff's land in the working of a copper-mill, which produced noxious gases, etc. It was referred to an auditor to find, first, whether the defendants had injured the said land in the way and manner set forth in the declaration; second, whether the plaintiff's land had depreciated in value, and to what extent the depreciation had been caused by the defendants. In *Locke* v. *Bennett*, 7 Cush. 445, the auditor passed upon the question whether the party making the purchase was an agent of the defendant. In *Leathe* v. *Bullard*, 8 Gray 545, the question as to whether there had been a waiver of a condition in a deed was sent to an auditor. *Rich* v. *Jones*, 9 Cush. 327, was an action in which there were several counts alleging different breaches of a special contract, and was sent to an auditor. *Star Glass Co.* v. *Morey*, 108 Mass. 570, was an action upon account annexed, the answer being fraud and misrepresentation in procuring the order, breach of express contract as to the quality and quantity of the goods delivered, and damages in consequence; that the defendant had refused to accept under the contract the goods which had been delivered, because different from those ordered and of inferior quality,—all of which questions were heard by an auditor, and his report held good. The case of *Moulton* v. *Parker*, 35 N. H. 92, was sent to an auditor. The report was offered in evidence, and the plaintiff moved that it be recommitted for the purpose of being amended, by striking out all except a bare statement of the accounts. In delivering the opinion of the court, FOWLER, J., says,—" From a view of all its provisions as well as from the manifest intention of the statute, it does not seem to us to admit of reasonable doubt that its true construction gives to an auditor full power and authority to consider, examine, and determine all matters of fact and of law arising in the progress of the trial before him, the determination of which is necessary to enable him to state fully and decisively the balance of indebtedness between the parties on the various claims embraced in the action submitted to his consideration." If he could not so hear and determine, what possible use could be made of his report? The court could render no judgment upon it, the jury could give it no weight, and there could be no possibility of the parties being satisfied with it. The auditor must have such power, or there must be a jury trial in nearly every case, and the object of the auditor law would thus be defeated. See *Pickering* v. *De Rochemont*, 45 N. H. 67; *Shouter* v. *Swindles*, 37 N. H. 559.

A diligent search has failed to convince us that questions like the above were, at and prior to 1792, for the consideration of equity courts alone, or that parties had not then as now a full remedy in such cases at law.

That an auditor's report is competent evidence for the consideration of a jury has been expressly recognized in this state; and the fact that the auditor law, which has stood on our statute books in practically the same form as at present for more than fifty years, has never been carried to the upper court on its constitutionality, is conclusive evidence that it has ever been held constitutional. The case of *Bell* v. *Wood*, 18 N. H. 305, was an action of assumpsit on account annexed. The plaintiff offered in evidence the report of an auditor. To rebut this, the defendant offered to prove that the auditor allowed the account on the testimony of a single witness; that his testimony was false, and his reputation for truth bad. The court, WOODS, J., said,—" The effect of an auditor's report is determined by the statute. It would wholly frustrate the aim and policy of this statute if the court were to allow evidence to be given for the purpose of weakening the effect which the statute assigns to the report. The party in whose favor it is made is entitled to the benefit of what he has gained to the extent to which the law gives it to him. * * * He [the defendant] is bound by the report to the extent to which the law gives it effect. The court correctly excluded the evidence that was offered." Therefore, if the legislature had a right to determine the effect of an auditor's report, as the court in this case decided, why have they not a right to decide the effect of a referee's report? In *Stalbird* v. *Beattie*, 36 N. H. 455, the court holds that in an appeal from one common law court to another, the report of an auditor in the court below is competent for the consideration of the court above. In *Conner* v. *Gas Pipe Co.*, 40 N. H. 537, it was held that an auditor's report, being competent evidence for the jury to consider, would in the absence of other testimony be sufficient to establish all the facts found in it, and it makes no difference which side introduces the report. Either party may do so without being estopped from denying its correctness in any particular, or precluded from impeaching it. In *Lull* v. *Cass*, 43 N. H. 62, the doctrine in *Conner* v. *Gas Pipe Co.* was fully endorsed, SARGENT, J., observing,—" Where an auditor's report is made, either party may use it at the trial, or the judge may require it to be read, and its findings are made *prima facie* evidence by statute." The court there recognize the right of the legislature to prescribe rules of evidence. In *Knowlton* v. *Tilton*, 38 N. H. 257, SAWYER, J., remarks,—" The report of an auditor is by the statute made evidence to the jury in support of the claim found due in the report. When the plaintiff had introduced that to the jury, it was unnecessary for him to proceed further in support of his case, although it might be made to appear that the claim found due by the auditor was for labor and services rendered under a special contract under seal. The statute making the report evidence implies that, in the absence of all conflicting evidence, it is sufficient to establish every fact material, or the proof of the claim, and among them, if that is material, that of a rescinding, waiver, or abandonment of the contract; "—thus going so far as to allow the auditor to pass upon the question as to whether the plaintiff had brought the right kind of action. In what respect can it

be claimed that the law of 1874 goes further, or in any respect more abridges or fetters the right of trial by jury than this ?

It is now well settled that an auditor's report makes a *prima facie* case. See *Shouter* v. *Swindles*, and *Pickering* v. *DeRochemont*, before cited ; *Pollard* v. *Verbeck*, 16 N. H. 435 ; *Putnam* v. *Goodall*, 31 N. H. 419 ; *Merrill* v. *Russell*, 12 N. H. 74 ; *Stone* v. *Aldrich*, 52 N. H. 435 ; *Allen* v. *Hawks*, 11 Pick. 359 ; *Lazarus* v. *Ins. Co.*, 19 Pick. 81 ; *Clark* v. *Fletcher*, 1 Allen 53 ; *Kendall* v. *Weaver*, *ib.* 277 ; *Barnard* v. *Stevens*, 11 Met. 297 ; *Bradford* v. *Stevens*, 10 Gray 379 ; *Holbrook* v. *Jackson*, 7 Cush. 136 ; *Locke* v. *Bennett*, *ib.* 445 ; *Rich* v. *Jones*, 9 Cush. 329 ; *Miller* v. *Pendleton*, 8 Gray 545 ; *Morgan* v. *Morse*, 13 Gray 150 ; *Jones* v. *Stevens*, 5 Met. 373 ; *Taunton Iron Co.* v. *Richmond*, 8 Met. 435—and the last two cases went so far as to hold that the auditor's report was not only evidence, but even changed the burden of proof.

Neither can it be said that the law under consideration imposes a penalty. It does not require either party to pay any referee or other fees as a condition precedent to his having a jury trial. Though a rule of court may so determine, that has nothing to do with the law, for it no more imposes a penalty than as if every cost incurred before a referee was paid by the county in the first instance. Entry fees are ordered to be paid, terms imposed, papers ordered to be filed, and numerous other expenses are to be paid and borne by the one party or the other, either as a condition precedent or subsequent, and no one has as yet claimed that it was a penalty or an infringement of a party's rights under the constitution ; and we fail to see wherein the payment of said fees differs in principle from paying referee's fees, or auditor's fees, should such be the order of the court.

In Maine, where the law regarding trials by jury is almost identical with ours (60 Me. 37), was a case where the legislature had established a court in Portland, and ordered that a jury fee of seven dollars should be required to be paid by the plaintiff before he was entitled to a trial by jury. The plaintiff carried up the case, on the ground that the law imposed a penalty upon the right of trial by jury, and was therefore unconstitutional. The court above, however, held otherwise ; thus conclusively showing the power of the legislature to regulate the costs, even although it might appear to impose some costs in addition to those previously inflicted.

No rule of court can render a law unconstitutional which otherwise is not. Apply the ordinary and well established rule in the construction of statutes to the one under consideration, and the court is bound to presume that the legislature intended the statute to act prospectively and not retrospectively, and to impose no penalty, unless the intention to do so is very clearly expressed. See *Rich* v. *Flanders*, before cited ; *Kennett's Petition*, 24 N. H. 139 ; *Colony* v. *Dublin*, 32 N. H. 432 ; *Dash* v. *Van Kleeck*, 7 Johns. 477 ; *People* v. *Tibbets*, 4 Cow. 384 ; *Hastings* v. *Lane*, 15 Me. 134 ; *Torrey* v. *Corliss*, 33 Me. 333. And we cannot expect, that in view of a principle so well established, the court will cite its own rule as a reason to declare any statute

unconstitutional which upon the adoption of a different rule, or of no rule at all, would be constitutional. Sec. 6, ch. 189, Gen. Stats., where the court is empowered to " establish rules and orders of practice consistent with the laws," cannot be construed as authorizing or allowing them to establish a rule which shall practically annul a law.

" Evidence of all the facts stated therein subject to be impeached by either party ; "—Referee Law, 1874. Impose a penalty? The court has held in substance that the above means conclusive upon the party until shown to be erroneous by a preponderance of evidence, as to admission of evidence tending to impeach auditors' reports ; and yet, with this interpretation, they hold the auditor law constitutional. If the same interpretation of the above clause will make the law of 1874 unconstitutional, then, according to the well settled rule in the interpretation of the statutes above named, the courts are not to so construe if there is any other reasonable way which would make the law constitutional. Impeach, from the Latin *impeto,* " to rush upon, assail, attack, to call in question "— *Webster* and *Worcester.* If, then, the usual meaning of " called in question " be given to the term impeached, as used in the referee law, and the courts, not the legislature, will allow it to be done in the usual and ordinary way, other things are called in question, admit what will tend to show its fallacy, not simply a preponderance of evidence, the one great objection to the constitutionality of the law is removed, *viz.,* concluding the minds of the jury by the report, open to attack only by preponderance of evidence.

It could as well, and better, be claimed, that the statutes enlarging the jurisdiction of the police justices in Manchester, and at other places in this state, impose a penalty where the appellant, who was before entitled to a jury trial in the first instance, must, within twenty-four hours after judgment rendered, file a bond or enter into a recognizance to pay the costs which may be recovered against him in the higher court, or his right to a jury trial is forever denied ;—and yet, the constitutionality of those statutes has never been denied in this state. The plaintiff, in any action, may bring his suit on a demand far exceeding the jurisdiction of a justice of the peace, as it stood in 1792, and as it now stands ;—and yet, unless the defendant, on the return day of the writ, shall, in writing, request a jury trial, he must submit to the judgment of the police justice, and, if dissatisfied therewith, he must within twenty-four hours file a bond, or enter into a recognizance as aforesaid, or he is barred from a jury trial. Far better, we say, to hold such a law as one affixing a penalty, than one where no costs are guaranteed, no bond required, no recognizance to be entered into.

It will not be questioned that the compulsory reference law of 1853 was in its main features identical with the present referee law, especially as to the admission of the report before the jury, making it *prima facie* evidence. " The courts of common pleas may, if they think proper, refer any civil action pending therein." This law was in force and acted upon until 1858, when it was repealed—for what reason is unknown ; but it is certain that it was never considered unconstitutional,

either by the legislature, the bar, or the bench. There are four reported cases, into the decision of which this law entered; and in *Chesley* v. *Chesley*, 37 N. H. 229, the admissibility and effect of a report were expressly considered and held admissible and *prima facie* evidence; and, further, that it must guide the court in rendition of judgment, whether put in evidence or not. The court was then composed of Ira Perley, Ira A. Eastman, Samuel D. Bell, George Y. Sawyer, and Asa Fowler; and it may well be claimed that they considered the law constitutional, and in fact so decided it, being judges who did their whole duty, a part of which was to take judicial cognizance of the provisions of the constitution, and base their decisions thereon.

We submit, therefore, that the referee law is not retrospective, does not impair vested rights, does not impose a penalty, and, like the auditor law, affects the remedy only, and is therefore constitutional.

\*FOSTER, C. J., C. C. The plaintiff excepted to the ruling of the court permitting the report of the referee to be introduced in evidence, upon the ground that " the statute of 1874, making the report of the referee evidence, is in contradiction of Art. 20 of the Bill of Rights, giving parties a ' right of trial by jury, except in cases in which it has been heretofore otherwise used and practised,' and providing that that ' method of procedure shall be held sacred.' "

It is not questioned that causes of the kind now before us were tried in New Hampshire no otherwise than by jury, before the adoption of the present state constitution. The learned counsel for the defendant, in their exceedingly able argument, contend that, because in the provincial and early state periods of our history the courts were not composed entirely of lawyers, and legal proceedings were exceedingly inartificial, therefore the historical substance of the jury trial of 1792, which my brother LADD, in *Copp* v. *Henniker*, 55 N. H. 179, says must be the test upon the question of the impairment of a constitutional right, is no test of anything; and the legislature can set up and establish such a jury trial as was often had before judges ignorant of law. That argument was considered by Judge PARKER, in *Pierce* v. *The State*, 13 N. H. 557, 558, where he says,—" It was well understood that the administration of justice [before the Revolution] was, in general, of a very inartificial character, and great complaints were made respecting it up to that period. How much of this was owing to the want of a competent knowledge of its true principles on the part of those appointed to administer the law, and how much to the alleged corruption of some of the incumbents of the bench, it is impossible now to determine. Certain it is, that, true or false, allegations of the latter character were not wanting in that period; and it is very clear that we cannot resort with much safety to the rulings or decisions of that time, for the purpose of determining a contested question involving legal principles.

---

\* SMITH, J., having presided at the trial at *nisi prius*, did not sit.

" Even after the Revolution, and the adoption of the constitution, although perhaps substantial justice was administered in most cases, little can be claimed for the courts on the score of their scientific administration of the law, according to strict legal rules. It was not, in the very nature of things, that legal investigations should be pursued, at that day, as they have been since. Until within a very limited period prior to that time, the administration of the law in England, with the exception of the law in relation to real property, had been in a state of transition, and was in many respects crude and imperfect; and it was not to be expected that those in this country who upon the acknowledgment of its independence had relinquished the sword, and were absorbed in the arrangement of the first principles of free political institutions, should immediately find time to study effectually and bring to the desired perfection a code of rules and practice which should best carry into effect the principles of the common law in regard to the administration of justice. If, therefore, we do not look with the utmost confidence to the period immediately succeeding the Revolution for precedents, it is not a matter of reproach to the men who were then engaged in laying, broadly and deeply, the foundations of a government, one of the fundamental principles of which is that ' every subject of this state is entitled to a certain remedy, by having recourse to the laws for all injuries he may receive in his person, property, or character, to obtain right and justice freely without being obliged to purchase it, completely and without any denial, promptly and without any delay, conformably to the laws ; '—and another, ' that it is essential to the preservation of the rights of every individual—his life, liberty, property, and character—that there be an impartial interpretation of the laws and administration of justice.' "

The decision in *Pierce* v. *The State,* overturning the uniform practice of the province and state down to a time as late, certainly, as the trial of Corey for murder, in Cheshire county, in 1830, and holding that the constitutional right of trial by jury would be violated by allowing the jury to decide the law, gives little weight to the old practice of unlearned judges in this state, and recognizes that only as a jury trial which was such by the true principles of the common law, as now held by our courts.

The argumentative opinion of Mr. Chief Justice PARKER seems to modify without contradicting or superseding the New Hampshire historical test, upon which my brother LADD relies, by an application of the fundamental idea of jury trial at the common law ;—and if Judge PARKER is right in that application, I am quite unable to contend or to discover that, by the true common law principle, a jury trial ever was, is, or can be a mere decision by a jury of the question, not presented by any pleadings in a cause, whether a different tribunal, auxiliary or other, have decided the issue between the parties rightly or wrongly. The substitution of that question in place of the real issue presented by the pleadings seems to me a most essential alteration of the substance of the jury trial of the common law ;—and such is, in fact, the issue

substituted by that provision of the thirteenth section of the law, which makes the report of the referee " evidence of all the facts stated therein, subject to be impeached."

Inclining (as I cannot but feel impelled) to agree with the argument of Judge PARKER, I do not, therefore, as already intimated, come into conflict with the views of my brother LADD. I recognize important principles and logical deductions in both cases. The difference seems to be this : Judge PARKER holds that the jury trial intended by the constitution was the pure and genuine jury trial of the English and American common law, correctly expounded ; my brother LADD makes the New Hampshire jury trial of 1792 the test of constitutionality as a historical fact.

Probably both these gentlemen are correct in their views, to a great extent. It may be that the New Hampshire practice before 1792 as a historical fact, and the jury trial of the common law as a principle, should both be considered in the effort to ascertain what kind of a trial the framers of the constitution meant and intended in 1792 by jury trial.

It may well be presumed that the non-professional judges of the province and of the revolutionary generation tried to give parties such a jury trial as they were entitled to by the common law, which was brought to this country by every English immigrant, and established as New Hampshire law. To suppose otherwise is to impute motives and behavior which ignorance of law and legal principles could not excuse nor extenuate. Those judges sometimes made singular work of it; but it ought to be inferred that their understanding was, that parties were entitled to a common law jury trial, and that their desire and effort were to give them such a trial. Such an understanding and intention are of vastly more weight in the present consideration than the want of success with which, on account of their lamentable ignorance of law, their efforts were attended.

I would not seem to be wanting in high respect for those judges of that period, who, like Judge Dudley, not only had no legal education, but possessed very little book learning of any kind acquired in the poor and homely schools of the day. " The strong common-sense, the keen sagacity, the discriminating mind, the retentive memory, the untiring patience, the integrity, proof alike against threats and flattery," of such men as John Dudley and Timothy Farrar, which commanded the respect and admiration of their contemporaries, deserve honorable mention in the history of their day, and reverent recognition by their successors. Nevertheless, it is not to be forgotten that the Revolution, which brought new men to the head of all departments of state—the best men, too, of those rough and stern times—brought no increase, in the first instance, of judicial science. See Life of Wm. Plumer 150 ; *Pierce* v. *The State, supra.*

In *Copp* v. *Henniker*, 55 N. H., at page 206, Judge LADD pertinently inquires,—" If the legislature can authorize the introduction of the decision of such a referee, as provided by the act of 1874, why can they

not authorize the judge presiding at the jury trial to act as referee, and give his decision of all the facts the same force and effect as is given to the decision of the referee appointed by that judge ?  *  *  *  Suppose the presiding justice (required by law to act as the auxiliary tribunal in all civil cases) instructs the jury in this case (as he would be bound to do) that in his judgment the town is guilty, and that they are bound to return his judgment as their verdict, unless it is proved to be erroneous, what is to be done with the authorities that hold it to be ' a settled principle of constitutional law that the court are the judges of the law, and the jury judges of the facts, involved in the issue ? ' *State* v. *Hodge*, 50 N. H. 516, 522, 523, 525."

It is not difficult for my brother LADD to propound questions like these ; but to answer such questions, in such manner as to sustain this law, is not within the compass of my ability.

And this suggestion, from the opinion in *Copp* v. *Henniker*, furnishes a further answer to the argument of the defendant's counsel—an answer, I fear, entirely conclusive.  If parties are entitled to no other jury trial than such as was often had before the judges of the revolutionary period, the doctrine of Judge PARKER, announced in *Pierce* v. *The State*, must be reversed ; and we must hold that juries may be made judges of the law in *all* cases—as in criminal cases they always were in this state prior to the year 1842.  And not only would the defendant's argument here reverse the doctrine of *Pierce* v. *The State*, but it would also allow the legislature to abolish every essential attribute of the jury trial, as it exists in the minds of educated lawyers, except that of the number twelve, and the unanimity of their verdict; for, under those " common-sense " judges who, like Dudley, expressed their abhorrence of Coke and Blackstone,* the jury trial was merely a dispensation of (or with) justice in each particular case, without law, contrary to law, according to the arbitrary sense of justice evolved by the feelings, passions, and interests of twelve men, instructed by a judge as ignorant as they to give such a verdict as they pleased.  It is not to be imagined that anybody will consent to such an administration of law as that, or believe that such an overthrow of all law, and such an arbitrary, capricious proceeding, is the true legal construction of the constitution that established trial by jury among a people who intended to bring with them to this country the jury trial of the common law of England,—a jury trial understood by educated lawyers to be defined by common law principles, which Dudley and some of his contemporaries probably tried, though unsuccessfully, to apply.  The judges of that class, in their generation, supposed they were administering the trial by jury in accordance with the true common law theory ;— when they failed to do that, they failed, not because they intended to change the jury trial of the common law, but because they were unable, from want of intellectual capacity, to do what they tried to do, and what they supposed they were doing.

---

* " Books that I never read and never will." DUDLEY, Life of Plumer, 154.

So the constitutional conventions of 1783 and 1792 must have had the same intent as those judges—Dudley, Farrar, and others. They must have intended such a jury trial as that of the common law of England, under which they had always lived, and which they adopted— not precisely that trial in every unimportant detail, but precisely that in substance and so far as its essentials were concerned. Judge SMITH, and others in the convention of 1792, did not understand the "sacred right" and "inestimable privilege" of trial by jury to mean such a trial as overturned all law before such judges as "never read and never would read" the "sages of the law." The "sacred right" and "inestimable privilege," not conferred but confirmed by the Bill of Rights, was, in the mind and intention of those who declared it, the common law jury trial in all its essential and time-honored attributes. And it is not possible that any other kind of jury trial can be sustained as the true legal construction of the constitution.

The authorities are numerous that construe common law terms in a constitution according to their common law signification. Our constitution is to be construed in the light of the common law. A system of jury trial such as our English ancestors never knew might have been created by our constitution makers, but if they had chosen such a creation they would have conferred upon their creature some distinctive and recognizable mark. Instead of this they used a familiar term to express their idea ;—but if any one will seek for a definition of the term, he must draw from that great fountain, the common law ; and in doing this he must bear in mind, as I said a little while ago, that this right of jury trial is not conferred but *confirmed* by the constitution ; that it is not the beginning of a law for the state, but that it assumes the existence of a well understood system which is to be continued in force and " held sacred." Cooley's Const. Lim. 60. If any common law term has a settled and definite signification, it is " trial by jury." And what shadow of an argument is there to show that a common law jury trial is had when a jury, instead of passing upon the real issue presented by the pleadings, weighing the evidence *pro* and *con*, pass upon the question whether some other tribunal has correctly decided the issue between the parties, starting with the decision of the other tribunal as making a *prima facie* case in favor of its own correctness ?

And when my brother LADD, in *Copp* v. *Henniker*, at page 207, inquires whether the people of New Hampshire in 1792 intended to secure for themselves and their posterity nothing more than a trial in which judgment should be rendered on the verdict that "The jury find [by a preponderance of evidence, or beyond all reasonable doubt, or beyond all possible doubt, as the legislature may choose to fix the weight to be given to the auxiliary decision] that the auxiliary decision is not shown to be wrong," I am compelled to confess that I see but one answer that can be given to the question without doing violence to all ideas of a legal, and all sense of a constitutional, character. If the constitutional jury trial is no more than that, it is nothing at all ; for the legal substance of jury trial (in whatever sense it is understood)

may be abolished by a great variety of ingenious statutes. If a jury can be compelled to give their verdict, not upon the issue between the parties, but upon the question whether an auxiliary decision of that issue is right, *giving to that auxiliary decision, as evidence of its own correctness, such weight as the legislature choose to prescribe,* the constitutional guaranty of jury trial is a delusion ; and if that guaranty can be repealed by legislative circumlocution, every other constitutional guaranty is a constitutional farce.

Now, to my mind, the foregoing proposition, which embodies the substance of my brother LADD's opinion upon this point, has the semblance of a mathematical demonstration, and the force and effect of a *reductio ad absurdum.*

It brings a great question of constitutional law down from the region of debate and logical reasoning, and puts it in a few arithmetical figures on the slate, in a form simple enough to be understood by any layman intelligent enough to understand the simplest sum in subtraction—for it is nothing else. " How can it be shown that such a proceeding is not a transfer of a part, small or great (according to the degree of effect given to the auxiliary decision), of the duty of deciding the issue from the tribunal to whom the constitution assigns the duty, to a tribunal to whom the constitution does not assign it ? " *Copp* v. *Henniker,* page 209. This question is fundamental, and not to be disposed of by astute evasion or general declamation. The learned and ingenious counsel for the defendant do not attempt to grapple with it. If any error is involved in the proposition and the inquiry before suggested, it is an error on so vital a subject, involving, as it does, the universal principles of constitutional construction, that nothing short of a mathematical demonstration of the error will satisfy any candid mind. Rhetoric will avail nothing against that simple sum in subtraction to which the whole matter is reduced. It is requisite to show by solid reasoning that there is an error in the process by which the whole matter is reduced to that sum, or it must be conceded that two taken from four leaves four.

And because of the great practical need (which I cannot fail to recognize) of a reform in the system of jury trial, and the establishment of a general system of trial by reference, at least of unimportant cases, it is with great reluctance and discomfort that I am compelled to acknowledge my inability to demonstrate or to discover any error in the argument resulting in the foregoing conclusions.

It is said in argument, by the defendant's counsel, that the legislature have authority and power to prescribe what shall and what shall not be evidence. Certainly they have, provided the legislature infringe no constitutional rights. But there are many constitutional rights which might be infringed by statutes prescribing rules of evidence.

" There is much authority [said DOE, J., in *Kent* v. *Gray*, 53 N. H. 578] for holding, in general terms, that a right to have one's controversies determined by existing rules of evidence is not a vested right; that

rules of evidence pertain to the remedies which the state provides for its citizens; that, like other rules affecting the remedy, they must at all times be subject to modification by the legislature.    *    *    *   Cooley's Const. Lim. 367.    But general statements of this kind are to be taken with the broad qualification that the changes must not infringe the general principles of justice." And upon page 579 Judge Doe continues: " A statute is not necessarily just and valid because it affects the remedy. The question is, not whether it affects the remedy, but whether it affects the remedy in a certain sense, and the remedy only. This point is forcibly illustrated in the dissenting opinion of Bell, C. J., in *Rich* v. *Flanders*, 39 N. H. 347, 348. If a statute, in terms made applicable to pending suits, should provide that no deed should be received in evidence unless the attesting witnesses were fifty years of age at the time of the trial, and if the retrospective character of such a statute were the only objection to its validity, it would not be made valid by the fact that it affected the remedy. It could not be applied to pending suits, or to deeds duly executed before its passage, because it would unjustly affect rights as well as remedies. Legal evidence of title could not be justly destroyed, however strongly the statute might profess to be exclusively aimed at the remedy. The principles of justice, declared by the prohibition of retrospective laws, are not evaded by words, names, and pretences; and when we have merely ascertained that a statute affects the remedy in some sense or other, we have made very little progress in the inquiry whether it affects a right,—that is, whether it is unjust on general principles. If a certain change can be made in the remedy, it is because it can be justly made: if a change cannot be made in the right, it is because it cannot be justly made."

The suggestion of Judge Doe, that no rule of evidence can be prescribed by statutes in violation of the constitutional prohibition upon retrospective legislation, will not probably be controverted. That prohibition protects title against a statute changing the rules of evidence, and rendering a seal unnecessary on a deed, or requiring three witnesses. Executed conveyances cannot be validated or invalidated by statutes retrospectively prescribing rules of evidence. That is one limitation of legislative power. The constitutional right of trial by jury is another limitation; and we certainly cannot say that the legislature may so change the rules of evidence as to deprive parties of such a jury trial as the constitution intended they should have. The rules of evidence may be so changed as to infringe the constitutional right of jury trial, and they may be so changed as not to infringe it. The legislative power of regulating evidence, like all other legislative power, is limited by every right guaranteed by the constitution; and to say the legislature may regulate evidence, is merely to say they may make any law on any subject that infringes no constitutional right.

Jury trial is a *remedy*, and remedies may be altered by the legislature; therefore the legislature may alter jury trial to any extent! That is the kind of syllogism which puts the argument in a definite shape.

The trouble is, the proposition that remedies may be altered by the legislature is subject to the supreme qualification that no constitutional right can be infringed by any alteration of remedies. Some superficial people have cheated themselves by a verbal distinction between rights and remedies, when the constitution recognizes no such distinction. Whatever we may mean by " remedy " in any particular case, the legislature cannot deprive parties of any right or any remedy secured to them by the constitution. And if the proceeding which my brother LADD has shown to be *a subtraction of essential jury power from the constitutional jury power* is an infringement of the constitutional guaranty, if it changes the substance of the jury trial which the constitution intended to secure, it is none the less unconstitutional because it is a change in the " remedy," or a change in the " rules of evidence."

To say the legislature can change remedies and the rules of evidence, is merely to say that, on those as well as all other subjects, the power of legisla..on is conferred by the constitution upon the general court. But still the great question remains, What is the legislative power on those and all other subjects ? And the answer remains, *The legislative power is the power of making constitutional laws.* And that limitation is not to be thrown off by any verbal description of " remedy," or " rules of evidence," or " *prima facie* case," or " burden of proof," or any other subject of legislation concerning which constitutional laws may be made. If the change in the " remedy " or the " rules of evidence " is such a change as has been heretofore described in the demonstration of the sum in subtraction, and if it is constitutional, then, by any legislation concerning the " remedy " or the " rules of evidence," we can abolish the whole constitution ; and that is, I suppose, a little further than anybody has gone or is willing to go.

Upon this point it may be profitable to regard what is said by Mr. Justice CURTIS in *Curran* v. *The State of Arkansas* (substituting the term " jury trial" for the term " obligation of contracts" there employed) : " If this law had contained only the first section, vesting the real property of the bank in the state, and providing no remedy by which this complainant, as a creditor of the bank, could reach it, we think it would have impaired the obligation of his contract. True, it does not touch the right of action against the bank ; it only withdraws the real property from the reach of legal process, and thus affects the remedy. But it by no means follows, because a law affects only the remedy, that it does not impair the obligation of the contract. The obligation of a contract, in the sense in which those words are used in the constitution, is that duty of performing it which is recognized and enforced by the laws. And if the law is so changed that the means of legally enforcing this duty are materially impaired, the obligation of contract no longer remains the same."

This has been the doctrine of the court from a very early period. In *Green* v. *Biddle*, 8 Wheat. 1, Mr. Justice WASHINGTON, delivering the opinion of the court, said,—" It is no answer that the acts of Kentucky now in question are regulations of the remedy and not of the

right to the lands. If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests."

In *Bronson* v. *Kinzie*, 1 How. 311, Mr. Chief-Justice TANEY, delivering the opinion of the court, and speaking of the above rule, as laid down in *Green* v. *Biddle*, said,—" We concur entirely in the correctness of the rule above stated. The remedy is the part of the municipal law which protects the right, and the obligation by which it enforces and maintains it. It is this protection which this clause in the constitution was mainly intended to secure." See 1 Kent. Com. (12th ed.) 420, note.

But to pursue this branch of the inquiry a little further : In the judiciary act of 1874, and in the laws relating to auditors, the legislature do not undertake to fix the weight to be given to ordinary evidence,— evidence in its common law sense ; but, as heretofore shown, they change the issue to be tried. For the issue raised by the parties, they substitute the question whether the auditor or the referee has weighed the evidence correctly and decided the issue rightly ; and on this substituted question (raised by the legislature, and not voluntarily by the parties) the legislature fix the weight which the jury shall give to the auxiliary decision, the correctness of which is the substituted issue. Obviously, if the legislature can do that, they can give such weight to the auxiliary decision as will make the jury trial of the substituted question of the correctness of the auxiliary decision a formal ceremony, of no practical value. If jury trial means anything, it means a jury trial of the actual controversy between the parties—the questions of fact about which they are contending. The legislature may prescribe the proceedings and forms in which the parties shall state those questions ; but when the parties have stated them in the prescribed form, and raised a distinct issue by their pleadings, then, for the legislature to send that issue to an auxiliary tribunal for decision, and then submit the secondary question, whether the auxiliary decision is right, requiring the jury to give such weight to that decision as the legislature choose to give it,—what is this but an arbitrary attachment of a certain weight to the auxiliary decision ; an attachment made not by the judicial department, who are entrusted by the constitution with the weight of evidence, but by the legislature ? And when the substituted question is, whether the auxiliary decision (that is, the auxiliary weighing of the evidence) is right, and when, upon that question, the auxiliary decision itself is to have as much weight in the minds of the jury as the legislature may arbitrarily choose to attach to it,—when we have gone as far as that, would the result be any plainer if we were to put it in this form, The legislature can, by a circumlocution, abolish the constitutional jury trial ?

There may be some nice questions about the right of the legislature to fix an arbitrary weight to ordinary evidence. The constitution establishes three departments of government—the executive, the legisla-

tive, and the judicial.   And the weighing of evidence in a judicial pro-
ceeding, in 1792, certainly was, as a general rule, the function of the
tribunal who heard the evidence, and not the business of general legis-
lation.   But waiving that point, and passing over all questions of legis-
lative power over the general rules of evidence,—when we say the
legislature can substitute an auxiliary *decision of the issue* instead of *the
issue*, and, upon the question of the correctness of that decision, give
that decision itself such arbitrary weight as they please, have we not
reached the end of the sum in subtraction ?   Have we not folded up
that part of the constitution relating to jury trial, and laid it away as
record evidence that the constitutional right is abolished ?

And so we are brought back to the point of original departure ; and
there stands the impregnable barrier of judicial argument and logic, ex-
pressed in *Copp* v. *Henniker*.   Condensed into a single proposition, here
it is: On no ground of constitutional principle can the legislature
send the issue to the presiding judge, or any other auxiliary tribunal,
for decision, and then leave to the jury only the question of the correct-
ness of the auxiliary decision, requiring the jury to give to that deci-
sion, on the trial of the question of its correctness, such weight as the
legislature choose to attach to it.

Confronting all power of declamation, of rhetoric, and of argument,
there stands the inevitable *reductio ad absurdum* of all opposing theories—
a battery with converging fire, from the range of which, retreat in the
best order practicable (but with expedition, at all events) seems to be the
suggestion of prudence.

In the commencement of his argument, the learned counsel for
the defendant remark to the effect that the provincial right of appeal
to the governor and council, and to the king, substantially destroyed
the right of jury trial in all important cases.

Then, in all *important* cases, we have no right of constitutional jury
trial now !   The argument of the learned counsel abolishes the right
of jury trial in all the important cases,—all the cases in which there was
an appeal to the governor and council, or to the king,—leaving us only,
perhaps, the right of a jury trial in cases where the amount in controversy
is less than $13.33, on appeal from a justice of the peace.   The ar-
gument shows, not that the referee law, in the respect under considera-
tion, is constitutional, but that, in important cases, the constitution
does not guarantee a jury trial at all!   But my brother LADD has
shown conclusively, as it seems to me, that the repeal of the right of
appeal to the governor and to the king, at the beginning of the Revo-
lution, and the continued abolition of such appeals from 1776 to 1792,
leave the constitution to be construed as if no such right of appeal had
ever existed.   *Copp* v. *Henniker*, 55 N. H. 191, 192.

So the argument of the defendant's counsel, from the statute re-
lating to the assessment of damage done by stray cattle, shows, if it
shows anything pertinent to this case, that the constitution does not

guarantee any jury trial at all. The case of the assessment of such damages was probably an exception to the right of jury trial when the constitution was adopted. N. H. Laws, ed. of 1771, pp. 67, 78, ed. of 1780, pp. 244–246, ed. of 1797, pp. 338, 343. But whether the estray law was an exception in which it had been " heretofore otherwise used and practised " or not, seems immaterial ; for, if it does not come within that exception, it proves that there is no such thing as a constitutional right of jury trial—and that is proving rather too much.

And finally, as to that part of the defendant's argument concerning the auditor law : That law is limited, in terms, to cases in which an examination of vouchers or an investigation of accounts is required. But whether it is inevitable that the auditor law and the statute under consideration shall " stand or fall together," as the defendant here suggests, is not a question now before us. My brother LADD *( Copp* v. *Henniker*, p. 209) is ready to stand on the authority of fifty years' acquiescence, and to regard it as settled by the precedent of so long a unanimous consent in cases expressly named in the auditor law, and to which by general consent it has been applied ; and it is earnestly to be hoped nobody will object to standing upon that ground, in view of its practically beneficent operation and results. And in any view that can be taken of the acquiescence in the auditor law (as an authority and a precedent, as distinguished from principle and constitutional logic), how can it be extended beyond the class of cases to which it was by its express terms applied, and to which alone the authority of fifty years' acquiescence applies it.

The defendant's counsel seem to argue, that because, in cases of accounts and vouchers, auditors may decide any question, therefore an auditor or referee may finally decide, without appeal to a jury, any kind of case. That is a palpable *non sequitur*. Cases of accounts were sent to auditors because they could not be conveniently and intelligently tried by jury. Of course, whatever tribunal tried such cases, must try every question involved. But it does not follow that in other cases a jury trial may be dispensed with.

My reluctant conclusion is, that that part of sec. 13, ch. 97, of the acts of 1874, which provides that upon the trial by jury of a cause which has been referred under the act " the report [of the referee] shall be evidence of all the facts stated therein, subject to be impeached ; " and so much of sec. 3, ch. 35, of the acts of 1875, as makes provision to the same effect, are in conflict with the constitution of the state, and are therefore void.

It is to be hoped the wisdom of the legislature, assisted by that of the legal profession, will devise some plan by which the substantial benefits of a constitutional reference law may be saved and secured.

Although cases have, as a rule of practice, been formally referred " by order of court," that formality has been usually interposed for no other purpose than to save the right of a subsequent jury trial, and so

causes have practically, in most cases, been referred by consent. With regard to cases thus referred without anything being said or done to indicate that a jury trial would be demanded, or that on such trial the admission of the referee's decision as evidence would be objected to, and also with regard to cases referred " by order of court," to which order no exception has been taken,—whether the parties should be held to have waived all objection to the operation of the whole referee law to their case in all subsequent stages of the cause, something, perhaps much, may be said when the occasion shall call for an expression of opinion. Our general doctrine of waiver is very broad. See *Patrick* v. *Cowles*, 45 N. H. 555.

LADD, J., concurred.

CUSHING, C. J. I find it impossible to agree with the opinions expressed by the majority of the court in this case, and I propose to indicate, as briefly as possible, the reasons of my dissent, and the authorities on which they rest.

The statute under consideration makes it the duty of the courts to commit to referees certain actions of certain specified classes, and provides that the report of the referees made in such a case shall be evidence to be laid before a jury; and it is objected, that a provision for thus submitting the report to the jury on the trial of a case, impairs the right of trial by jury as guaranteed by the constitution.

Art. 20 in the Bill of Rights is in the following words : " In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, the parties have a right to trial by jury ; and this method of procedure shall be held sacred, unless, in cases arising on the high seas and such as relate to mariners' wages, the legislature shall think it necessary hereafter to alter it."

By the law under consideration, it is provided that the report of the referee " shall be evidence of all the facts stated therein, subject to be impeached by either party." It is this provision which, as I understand the matter, is objected to as being in conflict with the section above cited from the Bill of Rights ; and the court is called upon to adjudge the statute, so far as dependent upon this clause, to be in conflict with the constitution, and therefore void.

The constitution is undoubtedly the supreme law of the state. It is the duty of this court to expound that law, and so to expound the statute law as that it shall not conflict with the supreme law.

Doubtless it may be, and sometimes is, necessary to declare a statute or a portion of it to be void. It is, however, I think, a universal principle, that statutes are not to be declared void by the court except in cases of plain and absolute necessity.

In the words of SARGENT, C. J.,—"While it is nowhere denied that in a limited government like ours, acting under a written constitution irrepealable except by the people themselves, and which imposes many

restraints upon the power of the legislature, and in which the judiciary is made a coördinate and independent branch of the government, the court have the power to declare the acts of the legislature void ; and it may become their imperative duty to do so, in the faithful exercise of their constitutional powers and discharge of their duties, yet, when called upon to pronounce an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, invalid and void in consequence of its conflicting with some constitutional provision, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and will never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond all reasonable doubt." *Rich* v. *Flanders*, 39 N. H. 304.

" In the case of *Morrison* v. *Springer*, 15 Ia. 304, the court held that it " will declare a law unconstitutional only when it is *clearly*, *palpably*, *and plainly inconsistent* with the provisions of that instrument ; " and Mr. Justice WRIGHT, in his opinion in that case, cites a long list of authorities in support of the rule announced. *Stewart* v. *Supervisors of Polk County*, 1 Am. R. 242 (Ia.) ; *Pickering* v. *Pickering*, 19 N. H. 391.

The question is emphatically one of New Hampshire law. It is the constitution of New Hampshire that we are seeking to understand and interpret, and it is to the traditions and decisions of the fathers in this law that we must, in the first instance, look for the light which is to guide us.

In order to determine whether or not the use of the report of the auditor or the referee impairs the right of jury trial as in use prior to 1783, it will be necessary to consider what is the effect given by our law to the report of an auditor or referee when used before the jury. The statutory provisions in regard to auditors and referees being the same, the decisions under one law in regard to this matter may very properly be applied to the other.

By the terms of the statute the report is to be laid before the jury as evidence, subject to be impeached by either party. In the case of *Bellows* v. *Wood*, 18 N. H. 305, it was held that the report could not be impeached by showing that it was founded on the evidence of a particular witness, nor by showing that there was not a full hearing before the auditor, nor by showing that the auditor did not give much attention to it. In other words, it is not admissible to impeach or sustain the report by testimony tending to show its weight as an instrument of evidence. *Drew* v. *Claggett*, 39 N. H. 431 ; *Shouter* v. *Swindles*, 37 N. H. 559. This decision of our court is evidently of the soundest. It is impossible to weigh a report as evidence, as the weight of testimony can be weighed, or to determine whether more or less credit can be given to it. If it were admissible to take into consideration the character of the auditor and the value of his judgment when known to the jury, it would be equally so to make these circumstances known to the jury by

evidence when the auditor was unknown to the jury. A moment's consideration is enough to make apparent the utter impossibility to weigh a report as evidence, or to show that it is entitled to more or less credit. It is, I think, impossible to sustain such a construction as this.

The attempt to treat a report as evidence to be weighed by the jury differs, in no degree that I can perceive, from the attempt to treat a former verdict of a jury in the same way. The absurdity of this attempt is admirably exposed by PARKER, C. J., in *King* v. *Chase,* 15 N. H. 9. Every word of that learned judge in that case applies to the case of one of these reports. " There are cases which hold that it,—*i. e.,* a verdict,—may be evidence between the parties when offered as a bar, but not conclusive evidence. See Doug. 517—*Kinnersley* v. *Orpe.* But this cannot be supported upon principle. The operation of such a rule would be to authorize the introduction of the verdict of one jury in evidence, not to show that the matter in question had been tried and settled, but to influence the minds of a jury, having a similar question before them, to find the fact in the same way that the former jury found it,—upon the faith that the first jury were capable, and duly investigated the subject upon competent proofs, and therefore probably found the fact correctly. It is quite evident that the weight to be given to it in that view is entirely uncertain. In order to understand its true value, and the weight which ought to be given to it in establishing the matter in question and upon trial, the capacity of former jurors should be shown, and the manner of the trial, that it may appear how distinctly the proofs themselves and the arguments used on the former trial should also be shown; for otherwise the second jury could not know whether the case was fully considered. And to all these there should be added a statement of the grounds upon which the former jury proceeded in making up their verdict."

It is commonly said, in practice, that the auditor's report is *prima facie* evidence of the facts properly contained in it. The term *prima facie* is somewhat ambiguous. In practice before juries, it is often said that the party has made out a *prima facie* case when he has offered evidence which, if the jury believe it, entitles him to a verdict. It is plain that this cannot be the construction of the statute, because if the report is not in some way impeached, it stands, and the jury is bound by it.

Sometimes the term *prima facie* evidence is used in the sense of a presumption of fact, *i. e.,* when a certain state of facts is to be assumed without proof, but which is open to be disproved. It has been well said that the term *presumption* is used in its literal sense of assuming a fact to exist without proof. It very often happens that states of fact are found to exist in which even-handed justice requires that other states of fact should be assumed to exist. Sometimes convenience requires the same thing ; but always presumptions are almost as likely to be contrary to the fact as consistent with it. Sometimes justice and convenience permit these presumptions to be rebutted, that is, the facts which

are assumed without proof to be disproved. These are called *presumptions of fact;* and I think that, strictly speaking, *prima facie* evidence is that evidence which raises a presumption of fact which binds the jury, and throws the burden of proof upon the party against whom it is made.

Other presumptions, sometimes called presumptions of law, are such as cannot be rebutted, and which the party against whom they arise is not permitted to deny by proof. They are substantially cases of *estoppel,* the technical difference being that *estoppel* is a term of pleading. A man is estopped when he is not permitted to aver a fact in pleading. A presumption of law is an assumed state of facts which he is not permitted to disprove by evidence. In the old days, when the pleadings were *ore tenus,* and the party was obliged to state in open court, at his peril, the facts, on the truth of which he was willing to place the merits of his case, the estoppel, literally, as its meaning imports, stopped his mouth. He was not permitted to aver such facts in court, by way of making up the issue for trial.

It is, I think, precisely in the sense of a presumption of fact that our statute makes the report evidence subject to be impeached. It establishes the facts found in it, not as evidence which the jury can weigh, but as a state of facts which is to be taken to exist until the contrary is proved, but in regard to which the report cannot be weighed either for or against the conclusion.

In other words, it simply has the effect of a pleading in determining the burden of proof.

This is, I believe, all that can be made of the auditors' or referees' report as an instrument of evidence before the jury. Ever since the beginning of jury trials, they have been always intimately connected with the system of pleading. The whole theory of jury trials from the beginning assumes that issues are to be made up originally oral, and afterward written, prepared before the trial, and reducing the matter as far as possible to the trial of single facts involved in each issue. Historically speaking, we are entitled to ask when it has been known, in the history of jury trials, that this whole matter of determining the order of the trial, the rules of pleading and the forms of issues, and the admissibility and effect of evidence, has not been within the control of the law-making power.

It has been said that the jury trial intended by the constitution must have been the jury trial as it existed in 1792—not the jury trial that existed in 1783, and was kept sacred by that constitution until '92, but the jury trial as it existed in '92. If, however, the constitution of '83 was faithfully observed, the jury trial, which was rendered sacred by that instrument, must have remained sacred till '92.

Now, when we speak of the historical jury trial as it was in 1783, it seems to me sufficiently certain that by that term we are not to understand a form of trial literally cast in a mould, and so hardened that it could never again be, in any respect, changed to meet the wants of changing times. The jury trial of 1783 was and must have been a jury

trial such as was then used and practised, that is, a jury trial subject to be changed and modified from time to time by legislation, as circumstances required.

I believe, too, that in our practice the authority of the English courts was always appealed to in all matters relating to trial by jury, as it was in most other matters of common law. I think that an examination of our reports will show that always we have received the reports of the cases in the English courts before and even since the Revolution as authoritative expositions of our law on this subject.

What then was the jury trial, as used and practised in the province of New Hampshire about the time of the Revolution? Undoubtedly it was a trial before a jury of twelve men whose verdict must be unanimous. It was a trial of issues of fact formed by the process of pleading, and made up according to the rules of that science. It was a trial of issues which had been made up by compelling the parties to put upon the record at their peril the facts on which they were willing to trust their case. It was a trial in which everything which the parties knew being theoretically elicited by the pleadings, their testimony, and the testimony of interested witnesses, was most rigorously excluded. By this system, in very many cases, the defendant could not offer proof of the matters on which his defence rested, without first admitting on the record the truth of everything alleged in the declaration. It is true, that before 1783 parliament had undertaken to interfere with the arrangement of issues for the jury trial by the statute of Anne, as it is called, which authorized double pleading. By enacting that the defendants at the same time might plead more than one plea, the legislature enabled him to compel the plaintiff to go forward in the first instance and make out his case, although it was really not intended to deny this case, but the real defence was to begin by admitting it;— that is, the legislature at that day assumed to regulate the burthen of proof by imposing upon the plaintiff the burthen of making out his *prima facie* case, as it was sometimes called, before he was permitted to put the defendant to prove his answer. It was an incident to jury trials before 1783 that the law-making power might in this way assume to regulate and arrange the burden of proof. This system of pleading had a material effect upon the arrangement of the burthen of proof, and oftentimes must have given one party or the other great advantage by relieving him from the necessity of making proof of matters which might be exceedingly difficult to prove.

But double pleading was never carried beyond the plea. When the plaintiff came to reply, he must meet each plea by a single replication, selecting at his peril that one answer which he was willing to rely upon. So, the rejoinder to each replication must be single. Such was the jury trial of 1783. Bacon's Ab., Pleas, K. 3; *Warren* v. *Joice*, 2 Str. 908.

It was clearly a jury trial in regard to which historically the legislature had assumed and exercised the power to change and regulate in a most material manner the burthen of proof. When the statute of Anne was first passed, the "leave of court," always inserted in the pleas after

the first, was not a matter form.   Quite a number of cases will be found in Barnes's Notes, in which the leave of court was refused ; but I think that as early as 1783 the practice had become settled by which in almost every case the defendant pleaded at his pleasure any number of pleas, inconsistent with each other or not, each plea being considered to stand independently of the others, and the confessions in one plea having no effect upon the denials in the others.

The case of *Carpenter* v. *Bailey*, 53 N. H. 590—56 N. H. 283—is a good illustration of the effect of the statute, permitting double pleading, upon the plaintiff's rights.

In that action, as is apparent from the history of it in the reported cases cited above, there was really no controversy about the fact of the publication complained of, but the only real controversy was as to its justification.   By the system of jury trials, pure and simple, as 'it stood before the statute of Anne, the defendant must have confessed the publication, and avoided the effect as well as he could by selecting from all his matter of defence that one which he thought most reliable.   In fact, however, he was allowed to put upon the plaintiff the burthen of making out his case in the first instance, and when the plaintiff applied at the proper national repository for the original paper it could not be found, and the plaintiff certainly was in peril of being defeated by the simple fact that, under what may be called the new system, he was required to prove an allegation, the truth of which in fact never ought to have been in dispute; that is, the plaintiff, by a legislative alteration of the constitution of the jury trial, was put to assume a burthen which otherwise would not have rested upon him.

This alteration was made by the law-making power before the year 1783, and was such a kind of legislation as the right of jury trial was before that time subjected to.

In 1824 the legislature of New Hampshire acted in the same direction, and passed the auditor law, by which the determination of the points in dispute, the making up the issues for a jury trial, and arranging the burthen of proof, was effected by the intervention of an auditor.

The right of the legislature to effect this by the auditor has never, so far as I know, been questioned.   The courts have not only sustained it, but also have given to it a construction which, in point of fact, draws to the auditor's jurisdiction nearly all issues of fact which may arise in a suit involving the investigation of accounts and the examination of vouchers.

In the cases of *Putnam* v. *Goodall*, 31 N. H. 419, *Ford* v. *Porter & Rolfe*, 32 N. H. 376, *Jones* v. *Parker*, 26 N. H. 20, *King* v. *Hutchins*, 28 N. H. 561, and *Brewer* v. *Hyndman*, 18 N. H. 9, it was held that whenever a case involves the investigation of accounts or the examination of vouchers, that fact draws to the auditor's jurisdiction the trial of all questions of fact involved, and, if I can understand those cases, I can conceive of hardly any question of fact which might not be drawn to trial before an auditor.

It appears to me that if these cases are law, they conclusively settle the question so far as authority is concerned.

If the court had held that the reference of such issues of fact to an auditor impaired the right of jury trial, it must either have sent the accounts alone to the auditor, or refused to send any part of the case to him.

It no more impairs the right of jury trial to send a matter of fact to a referee when there is no accounting made necessary by the writ, than it does to send such an issue of fact when there is an accounting called for in the writ. I think the court could not possibly have held as they held in those cases, without holding that the legislature had the power to refer issues of fact to the auditor, even if there are no matters of account.

Those who deny the constitutionality of the refereee law, but admit that of the auditor law, sometimes find the origin of the latter in the old action of account; but a short consideration will show how untenable is this position. The old common law action of account appears to have been always in force in Massachusetts and in New Hampshire. Our early books of American precedents, so far as I have seen them, contain precedents of declarations and pleas in this action. The action was not general in its application, but was used only in those cases where at common law, or by virtue of a contract, the party was bound to account in this way. The forms of pleadings in " Story's Pleadings " abundantly prove that the defendant might always traverse the allegations on which his liability to account depended. There were certain classes of cases in which, by virtue of the defendant's contract, or by the nature of his employment, and I think some cases of torts (*e. g.*, disseizin), in which it was a matter of right at common law that the plaintiff should have the account taken in this form of action. But, as I have said, the defendant was not bound to submit to this accounting until the question of his liability so to do had been tried by the jury ;— in other words, the right of trial by jury was preserved as sacred in this form of action as in any other. Besides, the auditor's judgment in this action was, as I understand, not conclusive, or even *prima facie* evidence. In Bacon's Ab., Accompt, F., it is said,—" If either of the parties before the auditors think they do him injustice, they may apply to the court, and if the defendant denies any article, or demurs to any demand, it is to be tried and determined in court."

I suppose the trial of any disputed fact in court involves a trial by jury without reference to any report, so that our statute finds no authority or precedent in this old action. The diligence and learning of counsel have not, that I know, suggested any other tribunal known by the name of auditor, or auditors, which was in use in any common law proceeding since the adoption of the present constitution.

Others find the source of the constitutionality of the auditor law in the chancery jurisdiction in matters of account. They suppose that the whole system of chancery law has always been in force in New Hampshire, and that the legislature while resisting, as I think they

undoubtedly did, the introduction of any part of the chancery jurisdiction by that name, in point of fact did, as it were, surreptitiously introduce that particular jurisdiction under the guise of the auditor law.

I do not think that the cases sustain this view. In *Wells* v. *Pierce,* 27 N. H. 7, it is said by BELL, J., that " the jurisdiction conferred on this court [that is, the superior court], in 1832, was as broad as equity itself." In *Parsons* v. *Parsons,* 9 N. H. 309, the court denied a remedy which was admitted to be according to the course of proceedings in equity, because it was not one of the chancery powers enumerated in the act of 1832, holding distinctly that the equity powers of the court at that time were statutory and limited.

So, in *Dover* v. *Portsmouth Bridge,* 17 N. H. 200, a case which, though decided earlier, was not actually reported until nine years after the report in *Wells* v. *Pierce,* Chief-Justice PARKER reiterates the assertion that the chancery jurisdiction of that court under the statute of 1832 was statutory and limited, and not general.

So that there is much authority, certainly, for the view which my slight historical research has led me to, that chancery jurisdiction in this state has been the product of legislation, and always subordinated to the constitution of 1792. And I think that the court in administering these powers would not so steadily have maintained the right of the parties to a jury trial had they understood that the system of chancery practice was a part of the existing law of New Hampshire, so that the chancery power given would carry with it all chancery practice. *Marston* v. *Brackett,* 9 N. H. 336; *Tebbetts* v. *Perkins,* 20 N. H. 275 ; *Dodge* v. *Greenwood,* 12 N. H. 573 ; *Hoitt* v. *Burleigh,* 18 N. H. 359.

The jurisdiction in chancery is in many respects essentially different from the jurisdiction of the auditor under our statute, and much less extensive. By our statutes, as construed by our courts, all cases may be referred to auditors in which an investigation of accounts or an examination of vouchers is necessary, and it is held that such a reference carries with it the trial of other questions of fact clearly of common law jurisdiction ; whereas, the equity jurisdiction in matters of account is confined mainly to matters strictly of chancery jurisdiction, either generally or for the sake of discovery. 1 Story Eq. Jur., ch. 8 ;—and, also, see particularly *Phillips* v. *Phillips,* 9 Hare 471—*S. C.,* 12 Eng. L. & E. 259—in which the learned Vice-Chancellor TURNER expresses himself very distinctly.

Here, then, we have a distinct assertion made by the legislature, and acquiesced in by the profession, and sanctioned by judicial decisions for a period of over fifty years, of authority to provide by legislation for making up the issues for jury trials, and regulating and sometimes shifting the burden of proof by the intervention of a trial before an auditor.

In the case of *Hoitt* v. *Burleigh,* 18 N. H. 389, it was declared that " a party to a bill in equity has a constitutional right to require a trial by jury of a contested matter of fact, if he asserts that right at the

proper stage of the cause;" and in the same case an order was made "that issues be made up by the court to be tried by the jury, that the answer of the defendant, Burleigh, may be used in evidence in the same manner that it would be evidence in a hearing before the court," &c.

It is familiar law, that, according to the equity practice of that day, the answer of the defendant to any matter distinctly charged in the bill was not merely *prima facie* evidence, but conclusive, unless met and overcome by something more than the evidence of a single witness. This and the other above cited cases prove that the court, while holding under the act of 1832 that the legislature had not power under the constitution to deprive a party in a chancery suit of a trial by jury, held also that the legislature could clothe the court with power to regulate the making up of the issues, the evidence to be admitted at the trial, and the burthen of proof. It is a distinct admission and assertion of the right and power of the legislature to control these matters as extensively as is involved in the auditor and reference laws.

In 1831 was enacted the statute permitting brief statements to be substituted for pleas. This statute at once scattered to the four winds what had been down to that time considered the essential elements and indispensable safeguards of the jury trial, viz., issues of fact presenting to the jury single points. The defendant huddles into his brief statement all the matters of avoidance which he desires to prove, and the plaintiff, without filing any replication, meets the matter in the brief statement by such evidence as he can. There can be no doubt that the introduction of the brief statement instead of the special plea changed materially the rights of the plaintiff, as secured to him by the jury trial of 1792. The general issue denying everything contained in the declaration, practically deprived the plaintiff of all benefit which he before derived from the confession which the defendant was obliged to put upon the record before he was allowed to avoid the charges in the declaration.

The next innovation was the statute by which the plaintiff was allowed to make any number of replications to each plea of the defendant. By the law of 1847, ch. 307, it was provided that the plaintiff might, as matter of right, file in answer to any plea of the defendant any number of replications. The effect of this was to impose upon the defendant the burthen of proving facts more or less, which, as the law stood before, he could not have been called upon to prove. As the law stood before, the plaintiff was obliged to select some one matter of answer to the plea, and rely upon that.

This might have been a denial of some material fact, or the confession of all the facts, and the avoidance of them by new matter in the replication. The effect of this legislation was, to impose upon the defendant the burthen of proving many facts, which, as the law stood before, he could not have been called upon to prove. In other words, it was a law providing for the making up of new issues, and imposing upon the defendant burthens which could not before have been im-

posed upon him. This was considered so important, that in the case of *Pickering* v. *Pickering*, 19 N. H. 389, it was held that in its application to pending suits it was unconstitutional, as introducing a new rule for the decision of the cause, that is, imposing upon the defendant the necessity of making proof of allegations which, as the law stood when the action was commenced, must have been admitted by the plaintiff.

Yet no one ever questioned the right of the legislature to make this great change in the mode of making up the issues and adjusting the burden of proof in trials by jury.

The last great innovation was the change in the law by which parties were permitted and compelled to testify. The system of pleading having been virtually abolished, and there being no longer, even theoretically, any mode by which the knowledge of the parties could be made available for the purposes of the suit, it was necessary that some other way should be devised by which their knowledge could be put to use in settling the questions at issue. I am not now discussing the question whether the change, by which parties were permitted and compelled to testify, was or was not an improvement. It was, at all events, a revolution, and the sturdy resistance which some able members of the court opposed to the introduction of that rule in regard to pending suits shows how strongly it was felt to be in derogation of the rights of parties as they existed under the historical jury trial of 1783.

It appears, by the notes to the great work on pleading by Stephen, that the jury trial which has come down to us was originally resorted to for the purpose of avoiding the plaintiff's wager of law, that is, of getting the plaintiff's testimony out of the case. It appears that at that time perjury in courts of justice was even more common than it is now! It is related of one of the kings of France, that, being much imbued with the piety of those days, and much a slave to their superstitions, and feeling sure that the witnesses in the courts would commit perjury, he supplied his courts with sham relics, on which the oaths were to be taken, so that the perjury might involve the least possible risk to the souls of the witnesses.

The form of jury trial which has been transmitted to us was introduced, according to this writer, for the purpose of excluding the plaintiff's testimony,—at least, in the form of the wager of law,—and appears always to have proceeded on the principle of excluding the testimony of the parties, the want of that testimony being supplied by compelling the parties to plead at their peril. The assumption, however, that the parties could always know the truth of their case as it would be made to appear by the testimony of witnesses other than themselves, turned out to be entirely without any just foundation. In truth, the rigorous system of pleading, perfect and beautiful in theory, turned out to be utterly impracticable. The difficulties were sought to be obviated by various statutory expedients—statutes of *jeofails* and others. Mistakes in pleading were allowed to be amended, and double pleading, as far as the first step was concerned, was allowed. (4 & 5 Anne, ch. 16.)

The imperious necessity of devising some way to escape from the

hardship involved in the system of pleading probably induced the courts to relax the rigor of the old system, and permit, as far as possible, the defences to be made under the general issue, especially in the action of assumpsit, on which, the promise being that implied by law from the facts alleged as the basis of the action, the denial of the promise involved the denial of all the material facts out of which the promise was implied. And in this way it came to pass that the plea of *never promised* in assumpsit opened most of the defences to this action. Still, there were some defences in this action which had to be pleaded specially, and the relief against the narrow limits of special pleading was found in the statute of Anne, above cited, by which defendants were permitted to plead by leave of court more than one plea. This relaxation, however, was limited by the construction of the statute to pleas ; and it was held that there could be but one replication to each plea, and one rejoinder to each replication.

This system was certainly in force in our state until, in 1831, the legislature swept away all these safeguards from the plaintiff's case at once by the statute which permitted a brief statement of the matters of defence, and permitted the defendant always to plead the general issue and throw that burthen upon the plaintiff, and, after compelling him to prove his case, then proceed to offer any number of inconsistent defences which the ingenuity of counsel might devise.

I think it cannot be successfully denied that this legislation materially affected the trial by jury of 1783, which the constitution required to be held sacred. It had always been held most material in trials by jury, to reduce the matters for trial to issues of single facts, and to arrange the burthen of proof accordingly. This was so material, and the want of it has been found to be so serious, that the courts have sometimes found themselves obliged not only to arrange the different points to be considered by the jury, but sometimes to set them down on paper in the form of questions to be taken to the jury-room, and there separately answered. Still further: the points of a case being all presented in this manner, it has been found necessary in our practice to set aside a part of the verdict to be tried over again and let the rest stand, and a verdict to be patched up out of the whole when the whole case had got correctly tried. I am not now criticising, either favorably or unfavorably, this legislation and practice. I only say that it is a good illustration of the manner in which the legislature has always exercised the right of providing for the arrangement of the preliminaries of a jury trial, and settling and sometimes shifting the burthen of proof, and regulating the admission of evidence, and the kind and quality of evidence used.

I have already alluded to the fact in the history of the jury trial, that one great purpose of its introduction was the exclusion of the parties as witnesses. In the historical jury trial of 1783 it was the right of the party to withhold his own testimony and exclude that of his antagonist. It is hard to imagine a more difficult or dangerous position in which a man can be placed, than to be called upon to testify in his own behalf.

It is a position which knaves are more willing to be placed in than honest men, and in which cool impudence and brass too often get the better of modest honesty. Under the jury trial of 1783 the party was not exposed to this ordeal,—more terrible, I think, to many than the ordeal by fire or water. He could neither be compelled to be badgered out of his rights by the insolence and audacity of counsel, nor cheated out of them by the cool and cunning perjury of his antagonist. That part of the system which aimed to draw from the parties what they knew of the facts by the pleadings has been abandoned, and instead of that has been substituted the duel of the parties in the presence of the court and jury. I cannot think that this innovation was not a material alteration in the rights of the parties under the old jury trial. But it has had the sanction of the court, and has been held not only to have been within the power of the legislature to make, but also to make operative in pending suits.

A very long and extensive experience has not satisfied me that the jury is the best tribunal before which to compel the parties to appear as witnesses ; neither has it satisfied me that the practice under the former system, by which the testimony of the party could be obtained when necessary for the elucidation of the case, has been advantageously replaced by the modern method. But I do not in the least question the soundness of the decisions which have sustained this legislation.

Meanwhile, the system of trial before auditors has been quietly gaining ground in the good-will of the suitors, and has been felt and known to have been greatly instrumental in the sound administration of justice, and in relieving the courts. In far the greater number of cases, when the parties had had an opportunity of presenting their proofs and their case to an intelligent auditor they were satisfied with the result, and the records of the courts I think will show this.

But here became apparent another advantage in the system, which perhaps had not been anticipated by its founders. The auditor's report usually contained a statement of the accounts, and it almost always happened that the contest before the jury had been narrowed down to a few disputed points, and thus, by the aid of an auditor and an examination of witnesses, the case had been simplified and fitted for a jury trial, and the issues framed. The problem which had baffled the ingenuity of whole generations of pleaders was in this way solved. A mode had been discovered by which the real points at issue could be separated from the rest of the case, and offered in a simple form for trial. The only change that is made in fact in the trial is this,—that sometimes the burthen of proof is shifted to the party who without the intervention of the auditor's or referee's report would not have borne it. The jury, instead of being told that one party in order to obtain a verdict must make the scales tip somewhat, be it ever so little, in his favor, would be now sometimes told that that was incumbent on the other party. Of the practical importance of this, different views will be taken by different persons ; but I feel quite sure that it was one of those arrangements preliminary to the jury trial quite within the power of our legislature to make, according to the views suggested.

This matter of shifting the burthen of proof for the sake of convenience is not unknown in our practice.

In *Vogt* v. *Ticknor*, 48 N. H. 241, our court held, after an elaborate discussion, that a creditor seeking to avoid a sale as having been made to hinder and delay creditors, might rely upon a judgment in his favor as evidence that he was a creditor.

In such a case, let us suppose that A, claiming to be a creditor of B, commences his action against him, and attaches as the property of B property held by C, by virtue of a sale from B.

Suppose that B contests the action, and after severe litigation A succeeds in obtaining a verdict against B.  C is not a party to this action, and has nothing to do with it; but when he comes with his action against A for taking his property, A has still to make out his indebtedness, and, according to *Vogt* v. *Ticknor*, although C was not a party to the first suit, and although the indebtedness of B to A is a fact essential to his defence which A has to make out, still, the judgment obtained against B is *prima facie* evidence for him.  Up to this time nothing has transpired to impugn the integrity of C.  Nothing is in evidence to make him at all responsible for the doings of B, yet, notwithstanding the maxim *res inter alios acta alteri nocere non debet*, and notwithstanding our case of *Warren* v. *Cochrane*, 27 N. H. 339, in which it was distinctly held that a judgment is not evidence against any one who was not a party or privy to it, C cannot maintain his right without taking upon himself the burthen of overthrowing a verdict and judgment obtained behind his back.  It is said by PERLEY, C. J., recognizing the maxim above cited, that "it may be perhaps taken for a uniform rule, that no one is concluded by a judgment or other act or transaction to which he was not actually or in contemplation of law a party.

"But it is not inconsistent with the spirit of the general rule, nor with the terms in which it was formally enunciated, that in certain circumstances and for certain purposes a judgment or other transaction should be taken for what it purports to be, even as to third persons, till something is shown to the contrary.   *    *    The act is not to injure third persons, *nocere non debet*, and in cases such as have been supposed it cannot be justly said that third persons are injured if the act is allowed to stand till something is shown to throw suspicion on its apparent reality and fairness."

I am unable to see any difference in principle between this case and the case of the auditor's or referee's report, excepting that the case is much stronger in favor of the auditor's or referee's report.  In each case a result is laid before the jury as evidence, which is supposed to place a heavier burthen upon the party than he would otherwise have to bear, and so, according to those who contend against the constitutionality of the reference law, the right of trial by jury is impaired.

Everything which is said by the court *arguendo* to show that some confidence ought to be placed in a judgment so obtained as evidence, applies with still greater force to the auditor's report, which, in point of

fact, is not between third parties, but in which the party himself has had an opportunity to be heard. In each case the principle is assumed, that when a result has been reached, either by a judgment between third parties or an auditor's report between the same parties, it is safe to treat it as evidence, and does not impair the right of trial by jury provided it is not held conclusive.

The court *arguendo* allude to decisions in Massachusetts and Vermont, in which it is held that judgments under such circumstances are *prima facie* but not conclusive evidence of a debt. The court also allude to the case of *Jenness* v. *Berry*, 17 N. H. 49, where it was held that a judgment, with the notes on which it was founded, was not *conclusive* evidence of the debt.

But in this case, whether such a judgment was evidence at all was a question not raised, and not at all discussed or settled by the court. The court also allude to *Sanford Mfg. Co.* v. *Wiggin*, 14 N. H. 441, in which it is said to have been held that the notes on which the writ was founded were not evidence at all of the debt. But in *Kimball* v. *Fenner*, 12 N. H. 248, and *Prescott* v. *Hayes*, 43 N. H. 593, it was held that such notes are *prima facie* evidence.

The decision in *Vogt* v. *Ticknor*, made under our constitution, is, I think, a distinct holding by the court that the admission of a judgment *inter alios*, as evidence subject to be impeached, does not impair the right of trial by jury, and I think is equally conclusive to show that the admission of an auditor's report under like circumstances does not impair the right of trial by jury.

It may be said that the decision in *Vogt* v. *Ticknor* is a judicial act, and not legislative, viz., not a making of the law, but a declaration of law which, at some other time and by some other power, has been made. The constitution, however, is the supreme law, and if making the decision of a tribunal before which the party has not had an opportunity to be heard evidence to be used before the jury against him, subject to be impeached or rebutted by evidence, impairs his right of trial by jury because of the burthen which it imposes upon him, it would seem that the existing law must have been held to be repealed by the constitution.

The language of the court in *Vogt* v. *Ticknor* is very much like the language of the reference law, and speaks of the judgment as evidence having some tendency to show the fact until impeached.

I think, however, that the reasoning of PARKER, C. J., in the case of *King* v. *Chase*, shows conclusively that this is not quite correct; that neither a judgment nor an auditor's report is capable of being weighed as evidence, but that their use simply relieves the party in the first instance, or, in other words, shifts the burthen of proof.

It is not to be understood that I in the least degree question the soundness of the decision in *Vogt* v. *Ticknor*. I think no one can read the case without seeing that the law was so held mainly as a matter of convenience, and that it really establishes the principle that in such a case, when convenience requires it, it does not infringe upon the

constitution for the court to hold and the legislature to enact such a rule of evidence. I am unable to find any distinction in principle, or in anything but convenience, between the case of *Vogt* v. *Ticknor* and the case of *Warren* v. *Cochrane*, above cited, in which the contrary was held.

In the recent case of *Howard* v. *Moot*, 64 N. Y. 262, the plaintiffs introduced in evidence an exemplification from the court of chancery of depositions taken in proceedings under the act, to perpetuate testimony respecting the title to the Pulteney estate, for the purpose of proving matters material in the case. Accompanying the deposition was an opinion and order of JAMES KENT, chancellor, to the effect that the said depositions did, in the opinion of the chancellor, furnish good *prima facie* evidence of the facts therein set forth. This was objected to by the defendant's counsel, on the grounds that the alleged facts were not established by the testimony offered, that the legislature had no power to pass a bill authorizing testimony to be taken *de bene esse* without giving an adverse party the right of cross-examination, and that the testimony was mere hearsay, and upon points where hearsay evidence was incompetent.

The admission of this evidence was sustained by the court of appeal, and I quote three of the marginal notes as follows:

" Rules of evidence are at all times subject to modification and control by the legislature, and changes thus made may be made applicable to existing causes of action."

"An act declaring any circumstance or any evidence, however slight, *prima facie* proof of the fact, is valid."

"Also, held that the legislature having thereby,—*i. e.*, by the act in question,—made the chancellor the final arbiter to determine what would be *prima facie* evidence of the facts stated, evidence taken in due form as prescribed by the act, accompanied by the opinion of the chancellor, properly given, and certified to the effect that it was good *prima facie* evidence of the facts stated, was, although the evidence was hearsay, competent and conclusive in the absence of any evidence to controvert it."

ALLEN, J., *arguendo*, says,—" The rules of evidence are not an exception to the doctrine, that all rules and regulations affecting remedies are at all times subject to modification and control by the legislature. The changes which are enacted from time to time may be made applicable to existing causes of action, as the law thus changed would only prescribe the rule for future controversies. It may be conceded, for all the purposes of this appeal, that a law that should make evidence conclusive which was not so necessarily in and of itself, and thus preclude the adverse party from showing the truth, would be void, as indirectly working a confiscation of property or a destruction of vested rights. But such is not the effect of declaring any circumstance or any evidence, however slight, *prima facie* proof of any point to be established, leaving the adverse party at liberty to rebut and overcome it by contradictory and better evidence. That this may be done is well settled by authority."

The principal if not the only argument against the constitutionality of the reference law is, that the use of the report in evidence imposes a burthen upon the party which he would otherwise not have to bear, and so impairs his right to a jury trial.

I have endeavored to show what the precise effect of the referee's report is upon the right of trial by jury, and to cite some of the cases which show that legislation productive of such effect has in many forms been held within the constitutional power of the legislature of New Hampshire.

It is not to be expected that the instances which I have cited will all be considered of equal force, and perhaps some of them may not seem important at all. Pleading, as known to the common law, is fast becoming one of the lost arts, and I do not by any means suggest that this is any injury to the science and practice of the law; but the fact of its little use now in this country is quite likely to make us forgetful of the important place it once held, and especially its intimate connection with the trial by jury, and its power as an instrument for eliciting and utilizing the knowledge of the parties in the preliminary arrangements for such trials.

On the whole, then, my opinion is, that the function of the auditor's and referee's report in this regard is, to fit the case for convenient trial by jury, and to arrange the burthen of proof; and I think that the enacting of such laws is entirely within the power of our legislature, according to the practice before and under our constitution. It is, in my judgment, with us merely a question of New Hampshire law.

The law for the appointment of auditors has been in its operation most beneficial; and I believe that the law in regard to referees, if sustained, will be equally so, and that the historical jury trial of 1783, and ever before and ever since, has been subject to be moulded and formed in these particulars by the legislature.

I find it impossible to hold that such a perfectly clear case has been made out as calls for or justifies the interference of the court to declare the law under consideration void, as exceeding the constitutional power of the legislature.

*Verdict set aside.*